16 U.S. 96 (____)
3 Wheat. 96
PATTON
v.
NICHOLSON.
Supreme Court of United States.

*97 February 19th, 1818. Swann, for the plaintiff.
*MARSHALL, Ch. J., delivered the opinion of the court.
That the [*207 use of a license or pass from the enemy, by a citizen, being unlawful, one citizen had no right to purchase of, or sell to, another, such a license or pass, to be used on board an American vessel.
Judgment affirmed.[(a)]
*98 
*99 
NOTES
[(a)] In the several cases, during the late war, of The Julia, 8 Cranch 181; The Aurora, Id. 203; The Hiram, Id. 444; s.c. 1 Wheat. 440, and The Ariadne, 2 Id. 143, the court determined, that the use of a license or passport of protection from the enemy, constitutes an act of illegality, which subjects the property sailing under it, to confiscation, in the prize court. The act of the 2d of August 1813, ch. 585, and of the 6th of July 1812, ch. 452, § 7, prohibiting the use of licenses or passes granted by the authority of the government of the United Kingdom of Great Britain and Ireland, repealed by the act of 3d of March 1815, ch. 766, were merely cumulative upon the pre-existing law of war. It follows, as a corollary from this principle, that a contract for the purchase or sale of such license is void, as being founded on an illegal consideration. That no contract whatever, founded upon such a consideration, can be enforced in a court of justice, is a doctrine familiar to our jurisprudence, and was also the rule of the civil law. It is upon the same principle, that every contract, whether of sale, insurance or partnership, &c., growing out of a commercial intercourse or trading with the enemy, is void. Thus, it has been held by the supreme court of New York, that a partnership between persons, residing in two different countries, for commercial purposes, is, at least suspended, if not ipso facto determined, by the breaking out of war between those countries; and that if such partnership expire, by its own limitation, during the war, the existence of the war dispenses with the necessity of *208] giving public notice of the dissolution. *Griswold v. Waddington, 15 Johns. 57. It is, perhaps, almost superfluous to add, that the use of a license from the government of the country itself, to which the person using it belongs, is lawful; and consequently, any contract between the citizens or subjects of that country, respecting such license, is also lawful. Thus, by the act of the 6th of July 1812, ch. 452, § 6, the president was authorized to give, at any time within six months after the passage of the act, passports for the safe protection of any ship or other property belonging to British subjects, and which was then within the limits of the United States. And such licenses are by no means, as has been commonly supposed, an invention of the present time. For Valin, speaking of the frauds by which the commerce and property of the enemy were screened from capture, during the war in which France and England were allied against Holland and Spain, not only on the high seas, but even in the ports of France, remarks, that previous to the ordinance on which he was commenting, no other means of counteracting these frauds had been discovered, than that of delivering passports to the vessels of the enemy, permitting them to trade with the ports of the kingdom, upon the payment of a duty of a crown per ton, which was done by an edict of 1673. Valin, Sur l'Ord.

But in order to protect a citizen in the use of a license from his own government to trade with the enemy, it is indispensably necessary, that he should conform to the terms and conditions under which it is granted; otherwise, the trading, and all contracts arising out of it, will be illegal. See the cases collected in Chitty's Law of Nations, ch. 8. To which add the following: The Byfield, Edw. 188; The Goede Hoop, Id. 327; The Catharina Maria, Id. 337; The Carl, Id. 339; The Europa, Id. 342; The Speculation, Id. 343; The Cousine Mariane, Id. 346; The Vrou Cornelia, Id. 349; The Johan Pieter, Id. 354; The Jonge Frederick, Id. 357; The Europa, Id. 358; The Cornelia, Id. 359; The Sarah Maria, Id. 361; The Henrietta, Id. 363; The Nicoline, Id. 364; The Wolfarth, Id. 365; The Emma, Id. 366; The Frau Magdalena, Id. 367; *209] *The Hoppet, Id. 369; The Bourse, alias Gute Erwagtung, Id. 370; The Jonge Clara, 371; The Minerva, Id. 275; The Saint Ivan, Id. 376; The Hector, Id. 379; The Edel Catharina, 1 Dods. 55; The Vrow Deborah, Id. 160; The Henrietta, Id. 168; The Bennet, Id. 175; The Dankerbarheit, Id. 183; The Seyerstadt, Id. 241; The Manly, Id. 257; The Æolus, Id. 300; The Wohlforth, Id. 305; The Louise Charlotte de Guldeneroni, Id. 308; The Freundschaft, Id. 316; Feise v. Thompson, 1 Taunt 121; Feise v. Waters, 2 Id. 249; Miller v. Gernon, 3 Id. 394; Fayle v. Bourdilla, Id. 546; Morgan v. Oswald, Id. 554; Feise v. Bell, 4 Id. 4; De Fastet v. Taylor, Id. 233; Le Cheminant v. Pearson, Id. 367; Freeland v. Walker, Id. 478; Waring v. Scott, Id. 605; Siffkin v. Glover, Id. 717; Effurth v. Smith, 5 Id. 329; Flindt v. Scott, Id. 674; Schnakoneg v. Andren, Id. 716; Robertson v. Morris, Id. 720; Staniforth v. Sonlha, Id. 626; Siffken v. Allnut, 1 M. & S., 39; Robinson v. Touray, Id. 217; Hagedorn v. Reid, Id. 567; Hagedorn v. Bazett, 2 Id. 100; Hullman v. Whitmore, 3 Id. 337; Gibson v. Mair, 1 Marsh. 39; Gibson v. Service, Id. 119; Darby v. Newton, 2 Id. 252.
Such licenses, when issued to the citizens or subjects of the state only, in order to legalize a limited commercial intercourse with the enemy, which is tolerated from political motives, of which every government is the exclusive judge, have nothing in them contrary to the law of nations. But when granted to neutrals, in order to enable them to carry on a trade, which they have a right to pursue, independently of the license, or to the subjects of the belligerent state, in order to enable them to carry on a trade, which is forbidden to neutrals, under the pretext of a proclamation of blockade, they are manifestly an abuse of power, and a violation of the law of nations. In both these cases, they would subject the property to capture, and to condemnation, in the prize courts of the other belligerent, and if issued to the subjects of that belligerent, by *the enemy, would also render it liable to confiscation, as being a [*210 breach of their allegiance.
The licenses granted by the officers of the British government, &c., during the late war, to American vessels, have been pronounced by this court, to subject the property sailing under them to confiscation, when captured by American cruisers; and it has been decided, to be immaterial, whether the licenses would or would not have saved the property from confiscation in the British prize courts (8 Cranch 200); but it has been made a question in those courts. how far these documents could protect against British capture, on account of the nature and extent of the authority of the persons by whom they were issued. The leading case on this subject is that of The Hope (1 Dods. 226), which was that of an American ship, laden with corn and flour, captured whilst proceeding from the United States, to the ports of Spain and Portugal, and claimed as protected by an instrument on board, granted by Allen, the British consul at Boston, accompanied by a certified copy of a letter from Admiral Sawyer, the British commander on the Halifax station. In pronouncing judgment in this case, Sir W. SCOTT observed, that if there was nothing further in the way of safeguard, than what was to be derived from these papers, it would certainly be impossible to hold, that the property was sufficiently protected. "The instrument of protection, in order to be effectual, must come from those who have a competent authority to grant such a protection; but these papers come from persons who are vested with no such authority. To exempt the property of enemies from the effect of hostilities, is a very high act of sovereign authority: if, at any time, delegated to persons in a subordinate station, it must be exercised either by those who have a special commission granted to them for the particular business, and who, in legal language, are termed mandatories, or by persons in whom such a power is vested, in virtue of any official situation to which it may be considered incidental. It is quite clear, that no consul, in any country, particularly in an enemy's country, is vested with any such power, in virtue of his station. Ei rei non præponitur, *and therefore, his acts relating to it are not binding. Neither does the admiral, [*211 on any station, possess such authority. He has, indeed, power relative to the ships under his immediate command, and can restrain them from committing acts of hostility, but he cannot go beyond that; he cannot grant a safeguard of this kind, beyond the limits of his own station. The protections, therefore, which have been set up, do not result from any power incidental to the situation of the persons by whom they were granted; and it is not pretended, that any such power was specially intrusted to them, for the particular occasion. If the instruments which have been relied upon by the claimants, are to be considered as the naked acts of these persons, then they are, in every point of view, totally invalid. But the question is, whether the British government has taken any steps to ratify and confirm these proceedings, and thus to convert them into valid acts of state; for persons not having full powers, may make what in law are termed sponsiones, or, in diplomatic language, treaties sub spe rati, to which a subsequent ratification may give validity: ratihabitio mandato æquiparatur." He proceeds to show, that the British government had confirmed the acts of its officers, by the order in council, of the 26th of October 1813, and accordingly decrees restitution of the property. In the case of The Reward, before the Lords of Appeal, the principle of this judgment of Sir WILLIAM SCOTT was substantially confirmed. But in the case of The Charles, and other similar cases, certificates or passports of the same kind, signed by Admiral Sawyer, and also by Don Luis de Onis, the Spanish minister to the United States, had been used for voyages from America to certain Spanish ports in the West Indies, and the Lords held, that these documents, not being included within the terms of the confirmatory order in council, did not afford protection, and accordingly condemned the property. 1 Dods. app'x, D. In the cases of The Venus and The South Carolina, a similar question arose on the *212] effect of passports granted by Mr. Forster, the British minister in the *United States, permitting American vessels to sail with provisions from the ports of the United States, to the island of St. Bartholomews, but not confirmed by an order in council. The Lords condemned in all the cases in which the passports were not within the terms of the orders in council, by which certain descriptions of licenses granted by Mr. Forster had been confirmed. Id.