# THE ADULA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

No. 167. Argued November 7, 1899. — Decided February 26, 1900.

A legal blockade may be established by a naval officer acting upon his own discretion, or under direction of superiors, without governmental notification.

In view of the operations being carried on for the purpose of destroying or capturing the Spanish fleet at Santiago de Cuba, and the reduction of that place, it was competent for the Admiral commanding the squadron to establish a blockade there, and at Guantanamo, as an adjunct to such operations, and such blockade was valid as against all vessels having notice thereof.

It appearing that Guantanamo was eighteen miles from the mouth of Guan-

tanamo Bay and was still occupied by the enemy, *held*, that although the American troops occupied the mouth of the bay, the blockade was still operative as to vessels bound to the city of Guantanamo.

The legal effect of a lawful and sufficient blockade is a closing of the port, and an interdiction of the entrance of all vessels of whatever nationality or business.

The sailing of a vessel with a premeditated intent to violate a blockade, is *ipso facto* a violation of the blockade, and renders her subject to capture from the moment she leaves the port of departure.

If a master has actual notice of a blockade, he is not at liberty even to approach the blockaded port for the purpose of making inquiries.

If a neutral vessel be chartered to an enemy, she becomes to a certain extent and *pro hac vice* an enemy's vessel, and a notice to her charterer of the existence of a blockade is a notice to the vessel.

It appearing in this case that both the charterer and the vessel had been previously engaged in bringing away refugees from Cuba, and were chargeable with notice of the military and naval operations against that island, that such facts were of common knowledge at the port from which she sailed, and that intercourse with Cuban ports was dangerous; and it appearing from a preponderance of evidence that both the charterer and master of the vessel had knowledge of the blockade: *held*, that the vessel was properly condemned.

If an examination of the ship's papers and the testimony of the crew, taken *in preparatorio*, make a case for condemnation, an order for further proof is only made where the interests of justice clearly require it: *held*, in this case that there was no error in denying the motion of the claimant for further proofs.

THIS was a libel in prize against the British steamship Adula, then under charter to a Spanish subject, which was seized June 29, 1898, by the United States cruiser Marble-head, for attempting to run the blockade established at Guantanamo Bay in the island of Cuba, and was subsequently sent into the port of Savannah for adjudication.

The Adula, a vessel of 372 tons, was built at Belfast in 1889, for her owner, the Atlas Steamship Company, Limited, a British corporation, and was registered in the name of its managing director, Sir William Bowers Forwood. Prior to the American-Spanish war she was engaged in general trade between Kingston and other ports on the coast of Jamaica, and from time to time had made voyages to Cuban ports. After the breaking out of the war the steamer was chartered by various persons in the intervals of its regular work, for voyages to Cuba.

In the meantime, however, under the command of Rear Admiral Sampson, a blockade was established at Santiago, where the Spanish fleet lay under the command of Admiral Cervera. Upon June 8, a blockade of Guantanamo Bay was also established by order of Admiral Sampson, the blockading squadron being under the command of Commander McCalla. Both of these blockades were maintained during the war. On April 22, a blockade of the north coast of Cuba between Cardenas and Bahia Honda and of Cienfuegos on the south coast, was declared by the President. On June 27, the President by proclamation gave notice that the Cuban blockade had been extended to include all the ports on the southern coast between Cape Frances and Cape Cruz. This included the port of Manzanillo. On the 28th, this proclamation was made known to the vessels off Guantanamo.

On June 27, the Adula, then at Kingston, was engaged in taking on a cargo for shipment. On the 28th she discharged this cargo, and the agent of the Atlas Company entered into a charter party with one Solis, a Spanish subject formerly resident in Manzanillo, of the material parts of which the following is a copy:

The Adula was put at the disposal of the charterer "for the conveyance of passengers from Cuban ports hereinafter to be named, to Kingston. The ports that the vessel is to go to are Manzanillo, Santiago and Guantanamo; but it is distinctly understood and agreed by the parties aforesaid that it shall not be deemed a breach of this agreement should the steamer be prevented from entering any of those ports from causes beyond the control of the company, but that should she be able to enter one or all of them, she shall embark the passengers that the charterer shall engage for her and proceed on her voyage. If she is not permitted to enter either Manzanillo, Santiago or Guantanamo, the vessel is to return to Kingston, and the voyage shall be considered completed, and the charter money hereinafter referred to earned without any deductions. . . . The charterer is to provide a good and efficient government pilot to conduct the ship safely into the ports which have been named. Should she be permitted to

enter them the charterer guarantees that the proper and efficient clearances shall be obtained for each port, so that the ship shall not be subjected to any fines for breach of regulations. . . . The company will give the option to the charterer for another voyage similar to this on similar terms, providing the charterer gives the company twenty-four hours' notice after the arrival of the steamer at Kingston."

Accompanying this charter were certain instructions, printed in the margin,[1] from the agent of the company to Captain Yeates, the commander of the Adula. These were taken from

---

[1] ATLAS STEAMSHIP COMPANY,
JAMAICA AGENCY, June 28, 1898.

Captain Yeates, S. S. Adula.

DEAR SIR: I enclose herein a copy of the agreement under which your vessel is proceeding on, and on board the ship will be the charterer, to whom I now introduce you, Mr. José R. Solis, and I ask you to show him every attention on the voyage.

You will see by a perusal of the agreement that you are on a voyage wholly and solely for the conveyance of refugees from the ports named to Kingston.

On your arrival at Guantanamo, to which port you will proceed direct, you will find, no doubt, American warships off the port. You will, when signalled to, stop immediately and communicate to the commanding officer the voyage that you are on, and, in fact, you can show him these sailing orders, and I do not think that the commanding officer will make any trouble whatever to your continuing the voyage into the port.

You must be careful on your arrival there not to interfere or in any way make any observation or sketches of anything that you may see or hear of, but adhere strictly to the duties of your ship.

At Guantanamo it is likely there may be some difficulty in obtaining a pilot, and if the commanding officer gives you permission to proceed it is just possible that he may be able to tell you where you can obtain the services of a pilot to go in.

From Guantanamo you will proceed to off Santiago. Here you will meet the other fleet, and carry the same instructions out with them as I have mentioned to you in reference to Guantanamo. The charterer is telegraphing at once to Santiago for a pilot to come off to meet the ship, if permission is granted, to pilot your ship into the port.

From Santiago you will proceed to Manzanillo, and from thence back to Kingston. The charterer, Mr. Solis, may order you direct from Guantanamo to Kingston or from Santiago to Kingston, and in such a case you will follow out his orders, which he will give you in writing. He has the option of going to the three ports, but it may be convenient for him to go to only one or even two. The boat's crew that is mentioned in the appendix of this agreement

the ship when she was captured. The Adula left Kingston late in the afternoon of June 28. Before sailing, Solis asked from the United States consul at Kingston a permit to enter the ports of Guantanamo, Santiago and Manzanillo. This the consul refused to give without special instructions from Washington. Just before sailing to Santiago, Solis cabled for a licensed pilot to meet the Adula. On leaving Kingston she took her course around Morant Point at the easterly end of the island, first toward Santiago, and then to Guantanamo, and about 4 P.M. of the following day was met before reaching the harbor and brought to by the steamship Vixen; was directed to proceed, entered the harbor of Guantanamo, and was seized by the Marblehead, which, with other vessels of the fleet, was lying inside the bay, and was sent to Savannah, where a libel in prize was filed against her on July 21, 1898. The depositions *in preparatorio* were taken July 21, and her owner, the Atlas Steamship Company, appeared as claimant and filed its answer. The case was heard upon the proofs *in preparatorio*, and a decree of condemnation entered July 28. (89 Fed. Rep. 351.) Before the decree, claimant moved for leave to take further proofs. The court set the motion down for August 9, giving claimant leave to serve such affidavits and other papers as it might desire to read upon the motion, and directed the entry of the decree to be without prejudice to such motion. The motion was finally denied, and the vessel released upon a stipulation for her value.

From the decree of condemnation her owner and claimant appealed to this court.

*Mr. Everett P. Wheeler* for appellant.

you will provide, but it will be necessary for you to have the ensign in the stern, so as to show your nationality.

You will not allow any provisions of any sort to leave your ship at any of the ports or to do anything that is contrary to the laws of the country, or that may be interpreted as a breach of faith in being allowed to pass the blockade and enter the ports, and I must ask you not to permit any of your crew to land at any of the ports, and only yourself, if necessary, to visit the British consul.

Wishing you a pleasant voyage, I am, sir,

Yours faithfully,

(S'g'd)    W. PEPLOE FORWOOD, *Gen. Ag't, Jca.*

Mr. James H. Hayden for the captors. Mr. Joseph K. McCammon was on his brief.

Mr. Assistant Attorney General Hoyt for the United States.

Mr. George A. King, Mr. William B. King and Mr. William E. Harvey filed a brief for the captors.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

The rectitude of the decree of the District Court condemning the Adula as prize of war depends upon the existence of a lawful and effective blockade at Guantanamo, the knowledge of such blockade by those in charge of the vessel, and their intent in making the voyage from Kingston.

1. No blockade of Guantanamo was ever proclaimed by the President. A proclamation had been issued June 27, establishing a blockade of all ports on the southern coast of Cuba between Cape Frances on the west and Cape Cruz on the east, but as both Santiago and Guantanamo are to the eastward of Cape Cruz, they were not included. It appears, however, that blockades of Santiago and Guantanamo were established in the early part of June by order of Admiral Sampson, commander of the naval forces then investing the ports on the southern coast of Cuba, and were maintained as actual and effective blockades until after the capture of the Adula.

The legality of a simple or actual blockade as distinguished from a public or Presidential blockade is noticed by writers upon international law, and is said by Halleck to be "constituted merely by the fact of an investment, and without any necessity of a public notification. As it arises solely from facts it ceases when they terminate; its existence must, therefore, in all cases, be established by clear and decisive evidence." (Halleck Int. L. chap. 23, sec. 10.) A de facto blockade was also recognized as legal by this court in the case of The Circassian, 2 Wall. 135, 150, in which the question arose as to the blockade of New Orleans during the civil war. In delivering the opinion of the court, the Chief Justice observed: "There is

a distinction between simple and public blockades which supports this conclusion. A simple blockade may be established by a naval officer, acting upon his own discretion or under direction of superiors, without governmental notification; while a public blockade is not only established in fact, but is notified, by the government directing it, to other governments. In the case of a simple blockade, the captors are bound to prove its existence at the time of capture; while in the case of a public blockade, the claimants are held to proof of discontinuance in order to protect themselves from the penalties of attempted violation." A like ruling was made by Sir William Scott in the case of *The Rolla*, 6 C. Rob. 364, which was the case of an American ship and cargo, proceeded against for the breach of a blockade at Montevideo, imposed by the British commander. It was argued, apparently upon the authority of *The Henrick and Maria*, 1 C. Rob. 123, that the power of imposing a blockade is altogether an act of sovereignty which cannot be assumed or exercised by a commander without special authority. But says the learned judge: "The court then expressed its opinion that this was a position not maintainable to that extent; because a commander going out to a distant station may reasonably be supposed to carry with him such a portion of sovereign authority, delegated to him, as may be necessary to provide for the exigencies of the service upon which he is employed. On stations in Europe, where government is almost at hand to superintend and direct the course of operations, under which it may be expedient that particular hostilities should be carried on, it may be different. But in distant ports of the world it cannot be disputed, I conceive, that a commander must be held to carry with him sufficient authority to act, as well against the commerce of the enemy, as against the enemy himself, for the immediate purpose of reduction." See also *The Johanna Maria*, Deane on Blockades, 86.

In view of the operations then being carried on for the purpose of destroying or capturing the Spanish fleet and reducing Santiago, we think it was competent for Admiral Sampson to establish a blockade there and at Guantanamo as an adjunct to such operations. Indeed, it would seem to have been

a necessity that restrictions should be placed upon the power
of neutrals to carry supplies and intelligence to the enemy, as
they would be quite sure to do, if their ships were given free
ingress and egress from these harbors.   While there could be
no objections to vessels carrying provisions to the starving
insurgents, if their destination could be made certain, the
probabilities were that such provisions carried to a beleaguered
port, would be immediately seized by the enemy and used for
the sustenance of its soldiers.   The exigency was one which
rendered it entirely prudent for the commander of the fleet to
act, without awaiting instructions from Washington.

But it is contended that at the time of the capture, the port of
Guantanamo was completely in the possession and control of
the United States, and therefore that the blockade had been
terminated.   It appears, however, that Guantanamo is eigh-
teen miles from the mouth of Guantanamo Bay.   Access to it
is obtained either by a small river emptying into the upper
bay, or by rail from Caimanera, a town on the west side of the
upper bay.   It seems that the Marblehead and the Yankee
were sent to Guantanamo on June 7; entered the harbor and
took possession of the lower bay for the use of American ves-
sels; that the Panther and Yosemite were sent there on the 10th,
and on the 12th the torpedo boat Porter arrived from Guanta-
namo with news of a land battle, and from that time the har-
bor was occupied by naval vessels, and by a party of marines
who held the crest of a hill on the west side of the harbor
near its entrance, and the side of the hill facing the harbor.
But the town of Guantanamo, near the head of the bay, was
still held by the Spanish forces, as were several other positions
in the neighborhood.   The campaign in the vicinity was in
active progress, and encounters between the United States and
Spanish troops were of frequent occurrence.

In view of these facts we are of opinion that, as the city of
Guantanamo was still held by the Spaniards, and as our troops
occupied only the mouth of the bay, the blockade was still
operative as against vessels bound for the city of Guantanamo.
Here again the case of *The Circassian*, 2 Wall. 135, is decisive.
The Circassian was captured May 4, 1862, for an attempted

violation of the blockade of New Orleans. The city, including the ports below it on the Mississippi, was captured during the last days of April, and military possession of the city taken on May first. It was held that neither the capture of the forts nor the military occupation of the city terminated the blockade, upon the ground that it applied, not to the city alone, but controlled the port, which included the whole parish of New Orleans, and lay on both sides of the Mississippi, and all the ports on that river and on the lakes east of the city. The following language of the Chief Justice is equally pertinent to this case: "Now, it may be well enough conceded that a continuous and complete possession of the city and the port, and of the approaches from the Gulf, would make a blockade unnecessary, and would supersede it. But, at the time of the capture of the Circassian, there had been no such possession. Only the city was occupied, not the port, much less the district of country commercially dependent upon it, and blockaded by its blockade. Even the city had been occupied only three days. It was yet hostile; the rebel army was in the neighborhood; the occupation, limited and recent, was subject to all the vicissitudes of war. Such an occupation could not at once, of itself, supersede or suspend the blockade. It might ripen into a possession which would have that effect, and it did; but at the time of the capture it operated only in aid and completion of the naval investment." The occupation of the city terminates a blockade because, and only because, it supersedes it, and if a vessel be bound to a port or place beyond, which is still occupied by the enemy, the occupation of the mouth of the harbor does not necessarily terminate the blockade as to such places.

Granting the existence of a lawful and sufficient blockade at Guantanamo, its legal effect was a closing of the port, and an interdiction of the entrance of all vessels of whatever nationality or business. It is well described by Sir William Scott in *The Vrouw Judith*, 1 C. Rob. 126, 128, "as a sort of circumvallation round a place, by which all foreign connection and correspondence is, as far as human force can effect it, to be entirely cut off. It is intended to suspend the entire commerce of that place, and a neutral is no more at liberty to

assist the traffic of exportation than of importation. The utmost that can be allowed to a neutral vessel is, that having already taken on board a cargo before the blockade begins, she may be at liberty to retire with it. But it must be considered as a rule which this court means to apply, that a neutral ship departing can only take away a cargo *bona fide* purchased and delivered, before the commencement of the blockade. If she afterwards takes on board a cargo it is a fraudulent act and a violation of the blockade." It is also said by Phillimore, 3 Int. Law, 383, that "the object of a blockade is to prevent exports as well as imports, and to cut off all communication of commerce with the blockaded place." The sailing of a vessel with a premeditated intent to violate a blockade is *ipso facto* a violation of the blockade, and renders the vessel subject to capture from the moment she leaves the port of departure. *Yeaton* v. *Fry*, 5 Cranch, 335 ; *The Circassian*, 2 Wall. 135 ; *The Frederick Molke*, 1 C. Rob. 72 ; *The Columbia*, 1 C. Rob. 130 ; *The Neptunus*, 2 C. Rob. 110 ; Wheaton on Captures, 196. If a master have actual notice of a blockade, he is not at liberty even to approach the blockaded port for the purpose of making inquiries of the blockading vessels, since such liberty could not fail to lead to attempts to violate the blockade under pretext of approaching the port for the purpose of making such inquiries. *The Admiral*, 3 Wall. 603 ; *The Prize cases*, 2 Black, 635, 677 ; Duer on Ins. 661 ; *The Cheshire*, 3 Wall. 231 ; *The James Cook*, Edwards, 261 ; *The Josephine*, 3 Wall. 83 ; *The Spes*, 5 C. Rob. 76 ; *The Betsey*, 1 C. Rob. 280 ; *The Neptunus*, 2 C. Rob. 110 ; *The Little William*, 1 Acton, 141, 161 ; *Sperry* v. *Delaware Ins. Co.*, 2 Wash. C. C. 243. If there be any distinction in this particular between a proclaimed blockade and an actual blockade by a naval commander, it does not aid the Adula in view of the admitted fact that she was informed by the Vixen that the port was under the control of the United States military forces, and that the war ships were visible before she entered the bay.

In this connection we are cited by counsel for the Adula to a change in the law said to have been effected by the adhesion of this Government, at the beginning of the war, to the

declaration of Paris abolishing privateering. This supposed change apparently rests upon an extract from a French treatise upon international law by Pistoye and Duverdy, vol. 1, p. 375, in which it is said that by the modern law, in consequence of the declaration of Paris, a vessel must be notified to depart from the blockaded port before she can be captured, and that the contrary rule was the result of the doctrine of the British Orders in Council during the Napoleonic wars, which is now given up by that country. It is also said that "the old rule was that it was a breach of blockade to enter upon a voyage to the blockaded port. This rule is now changed, because neutrals are obliged only to respect effective blockades. It may well be that a blockade of which official notice has been given is not an effective blockade, or it may be that a blockade which has been established by a sufficient force may have ceased to exist. Neutrals then have the right to begin a voyage to a blockaded port in order to see if the blockade still continues. They are only guilty when, while the blockade continues, they actually endeavor to break it."

We cannot, however, accept this opinion as overruling in any particular the prior decisions of this court in the cases above cited, to the effect that a departure for a blockaded port with intent to violate the blockade renders the vessel liable to seizure. When Congress has spoken upon this subject it will be time enough for this court to act. We cannot change our rulings to conform to the opinions of foreign writers as to what they suppose to be the existing law upon the subject.

We have not overlooked in this connection the provision contained in Art. 18 of Jay's treaty of 1794, to the effect that " whereas, it frequently happens that vessels sail for a port or place belonging to an enemy, without knowing that the same is either besieged, blockaded or invested, it is agreed, that every vessel so circumstanced, may be turned away from such port or place, but she shall not be detained nor her cargo, if not contraband, confiscated, unless after notice she shall again attempt to enter." *Fitzsimmons* v. *Newport Ins. Co.*, 4 Cranch, 185. Waiving the question whether this clause of Jay's treaty was abrogated by the war of 1812, and accepting it as a cor-

rect exposition of the law of nations, it applies only to vessels which have sailed for a hostile port or place without knowing that the same is either besieged, blockaded or invested. The whole case against the Adula depends upon the question whether those in charge of her knew before she left Kingston that Santiago and Guantanamo were blockaded. If they did, the treaty does not apply. If they did not, they are entitled to the benefit of this principle of international law. In the case of the *Maryland Ins. Co.* v. *Woods*, 6 Cranch, 29, in which it was held that the vessel could not be placed in the situation of one having notice of the blockade until she was warned off, the decision was placed upon the express ground that orders had been given by the British government, and communicated to our government, " not to consider blockades as existing, unless in respect to particular ports which may be actually invested, and then not to capture vessels bound to such ports, unless they shall have been previously warned not to enter them." This order was treated by the court as a mitigation of the general rule so far as respected blockades in the West Indies.

2. The questions concerning the notification of, and the intent to, violate blockade depend largely upon the same testimony, and may be properly disposed of together. There is no doubt that the Adula belonged to a British corporation, the Atlas Steamship Company; was registered in the name of the managing director of such corporation; flew the British flag, and prior to the Spanish-American war was engaged in general trade between Kingston and other ports on the coast of Jamaica, in connection with other steamers of the same line from New York, and from time to time had made voyages to Cuban ports. After the breaking out of the war the steamer was chartered by various persons, in the intervals of its regular work for voyages to Cuba. On May 7, in pursuance of a verbal arrangement between the agent of the steamship company and the American consul, the Adula was sent to Cienfuegos in Cuba to bring away refugees. On arrival off Cienfuegos she was boarded by officers of the U. S. S. Marblehead, who, upon being shown the permit and the ship's papers, allowed her to proceed, though the officers served the master with a

printed copy of the President's proclamation blockading Cienfuegos and several ports on the north side of Cuba, and made a memorandum on the ship's log that they had done so. She sailed from Cienfuegos May 10, with 350 passengers, mostly women and children; was again boarded on leaving the port, but was allowed to proceed.

On May 16, she was chartered by a Cuban refugee to proceed to Santiago; arrived there the following day, and returned with 200 passengers. No war ships were off Santiago at that time. She arrived at Kingston on the 19th, and landed her passengers.

On May 21, she was again chartered to go to Cienfuegos, having a permit from Washington, through the consul, to pass the blockade. She reached the blockading fleet on the 23d, was boarded by a boat from one of the vessels, and was again given permission to proceed; was arrested upon suspicion by the Spanish authorities in the port of Cienfuegos, but after a detention of sixty hours was released. She sailed again on May 26 directly for Kingston; saw no war ships in sight, and arrived at Kingston on May 28.

After making two of her ordinary coasting voyages around Jamaica, she was offered a further charter for Cienfuegos, but could not obtain the permission of the American consul, who told the master he had no authority to grant it. She left June 15, with a letter of instructions to the captain to proceed to the fleet off Cienfuegos, then under a public blockade, to ask permission from them to enter the port, and if granted, to go in, and if not granted, to return to Jamaica. She arrived at Cienfuegos June 17; landed some provisions which had been shipped for her passengers, found no war ships there, and sailed away on the 19th with only ninety-eight passengers. Sixty miles S.S.E. from Cienfuegos she was stopped by the U. S. S. Yankee, and an officer sent on board. The master showed the boarding officer his instructions and the ship's papers, as well as the passenger list; was informed that Cienfuegos was blockaded, and that he must not enter it again. She arrived in Kingston on June 21; proceeded around the island on her usual coasting trip, and returned to Kingston on the 27th.

She was chartered for her last voyage June 28, by one Solis,

a Spanish subject, born near Havana, and living with his family at Manzanillo. He had landed recently from Manzanillo with a cargo of refugees. He had lived in Cuba, and at one time had been the French consul at Manzanillo, though there was no evidence that he had ever coöperated with the Spanish authorities during the war, or rendered aid or comfort to the Spanish forces. He had, however, a passport from the Spanish consul to enter the cities to which he was bound and take passengers away as refugees. He had previously been engaged in shipping supplies to Cuban ports and returning with passengers for Jamaica. He also carried a special personal Spanish passport granted the year before. Such being his political character, he entered into a charter party with the Atlas Steamship Company, under which he was at liberty to go to Manzanillo, Santiago and Guantanamo, and if not permitted to enter these harbors, to return to Kingston. An option was also given to the charterer for another similar voyage upon like terms upon twenty-four hours' notice after arrival at Kingston. The charter was for the conveyance of passengers from Cuban ports to Kingston at one hundred pounds per day. Solis was entered upon the ship's articles as supercargo. She was evidently chartered for his personal benefit, with power to name the port which she was to visit, but with no right to interfere with the navigation of the ship. Solis had made the same sort of trip twice before with English schooners, and expected upon this trip to make $19,000 net profit. He appeared to have known nothing about the previous voyages of the Adula, and had seen her for the first time only about two months before. The vessel bore a passport from the Spanish consul at Kingston; a bill of health *viséd* by the Spanish consul. With regard to his knowledge of the blockade at Guantanamo he testified as follows:

" I knew that there was a condition of war existing between America and Spain on the 21st. They told me on board the Adula that the blockade of Guantanamo was published on the 27th, the day before. I had not heard it before I left Kingston. I did not know officially Guantanamo was blockaded. On board the Adula I heard that on the 27th there was issued

an order from the President of the United States declaring a blockade of the port of Guantanamo, but I did not know it until we arrived at Guantanamo. At Kingston I heard there were some war ships at Guantanamo, and I told Captain Forwood that the first thing I would do would be to go to the admiral and tell him my intentions. I did not think the papers in Kingston published the blockade. I did not see it if they did. The people generally did not talk about it. I read something about 'McCalla's camp.' I understood Guantanamo was not blockaded by the United States. I heard that marines had been landed at the entrance to Guantanamo, Caimenera — the bay is called Caimenera — and that the marines had possession of the port, and that the ships were inside. I cannot tell when I received the information that marines had been landed there and taken possession of the point of Guantanamo or Caimenera. Perhaps it was one or two days before. I don't know what the others knew about a state of war existing. I understood Guantanamo was not declared officially blockaded, although there were some vessels there. I got that information from newspapers in Kingston, and from those newspapers I got the information that marines had been landed at the entrance to the bay on the east side; they call it 'East Point.' "

It further appeared that the American consul warned Mr. Forwood, the agent of the ship at Kingston, of the existence of the blockade in the following language, as stated by the agent himself: " ' Well, Forwood, I would not advise you to let the ship go; they won't let her into Guantanamo, and they will be watching for her.' I said to him, ' Oh, Dent, let me show you the captain's instructions. He has got orders to go to the fleet there and ask their permission to take some refugees.' ' Well,' he said, ' I don't know, but they will be watching for her, and I think that Senor Solis is a Spanish agent, carrying $300,000 in gold to buy over the rebels in the American camp.' I told him that I had inquired about the man, and that it was one of the usual Kingston yarns." It also appears that Mr. Forwood knew that Mr. Solis was a Spaniard, and had been shipping supplies to Cuban ports. After taking on board a large supply

of coal, the Adula left Kingston on June 28; rounded Morant
Point on the east end of the island of Jamaica; proceeded at
her usual speed toward Santiago, and sighted the blockading
fleet off that port about noon of the 29th. The captain gives
as his reason for going by the way of Santiago that he was not
acquainted with the coast line to the eastward of that port; had
no large scale chart, and therefore steered more to the west-
ward than he should have done, because he knew the coast
about Santiago, and did not know that about Guantanamo ;
but it is quite as probable that it was the presence of a num-
ber of war vessels off Santiago which sent her to Guantanamo.
She was hailed by the Vixen within half a mile of the entrance
to the harbor of Guantanamo, brought to, and then directed
into the harbor, where several war vessels were lying, and was
shortly thereafter seized by order of Commander McCalla of
the Marblehead.

In his testimony before the prize commissioners, Captain
Yeates, master of the Adula, stated that he was stopped by the
Vixen about a half a mile from the entrance to the bay and
permitted to proceed, and that it was not until after he had
anchored that he was acquainted with the blockade of the
harbor. One of the crew testified somewhat to the contrary
and swore that " about three days before I left Kingston I heard
that Guantanamo was blockaded; I heard it from people around
the streets; I did not see it; I heard it was in the papers; I
never heard any of the officers of the Adula or people on board
talking about Guantanamo being blockaded, and I don't know
exactly whether the owner or master or officers of the ship
Adula knew that Guantanamo was blockaded. I knew about
it, but I don't know anything about them. I don't know
how I found it out, but I heard it on the streets of Kingston."
He also swore " that at that time he went up to the mouth of
the harbor, and at that time, when we got to Guantanamo, we
found the war ships there blockading the harbor." A small
cruiser, the Vixen, "ran up across our bow and the captain of
the cruiser asked us : ' Didn't you sight the war ships down
at Santiago?' and the captain said, ' Yes.' And the captain
stopped, and he said : ' Didn't you hear that Guantanamo was

blockaded?' and our captain said 'Yes.' Then he said, 'You can proceed on.' I heard about the blockade in Kingston, but after leaving Kingston, until we met the cruiser, I never heard anything more about it." Captain Yeates also testified that he expected to be stopped when he approached Santiago. Mr. Solis, who had chartered the Adula for this voyage, testified that he was told, while on board the Adula, that the blockade of Guantanamo was published on the 27th, the day before, but that he had not heard of it before he left Kingston, though he had heard, while in Kingston, that there were some war ships at Gauntanamo. At the time the Adula was captured she was searched for her ship's papers and other documents and letters. Several letters were found, as well as copies of a newspaper published at Kingston, which spoke of the American military and naval operations both at Santiago and Guantanamo.

Among these extracts from The Gleaner of July 14, 1898, is the following, apparently telegraphed from London: "A dispatch boat off Santiago reports that the Americans now hold thirty-five miles of the coast east of Santiago, including Guantanamo harbor, and that 20,000 Spanish troops at Santiago are preparing to desperately resist the Americans, who have landed 3000 rifles, 300,000 rounds of ammunition, and large stores of provisions;" and the following from the issue of June 25: "On board the Adula, which arrived from Cienfuegos this week, there was an individual officially appointed by the Captain General in Cuba to make arrangements in Jamaica for regularly supplying the Spanish troops with provisions; in fact, to make Jamaica a base for Spanish purposes."

In this connection it would seem from the report of the Bureau of Navigation that the consul at Kingston telegraphed to Washington that the Under Secretary of the Captain General of Cuba and certain Spanish naval officers "came aboard the Adula with, it is supposed, $250,000 to purchase provisions to be taken to Manzanillo for Cervera. . . . Extensive preparations being made for shipping provisions to Cuba."

In a letter from Captain Yeates to his parents, under date of July 13, and apparently written while the Adula was at Savannah, he says: "And now to tell you dear ones how it is

or was that we got into this pickle, which has not come as any
surprise, as I have anticipated this for some time; it is I did
not think I should be in command when it happened, but it
was my luck to be, I suppose." Speaking of the capture, he
says: "They turned the ship upside down; took my papers;
measured the coals, and took stock generally. As far as the
ship is concerned she was on perfectly legitimate business, fetch-
ing refugees. Whether Mr. Solis chartered the ship for that
purpose alone, of course, has to be proved, and we are now on
our way to Savannah for that purpose with a prize crew and
Lieutenant Anderson in charge." In a postscript dated at
Savannah, July 15, he says: "We have not yet reached the
town proper, for we are going through the same performance
as we did at Tampa, but I was not caught this time, for I
managed to keep my things out of the oven."

As tending to show the good faith of this expedition, and
more particularly the owners of the Adula, much reliance is
placed upon the letter of Mr. Forwood to Captain Yeates of
June 28, the day upon which the Adula left Kingston, in which
he instructs him, in case he finds American war ships off Guan-
tanamo, to stop immediately upon being signalled, and commu-
nicaté to the commanding officer the object of the voyage, and
to be careful upon his arrival "not to interfere, or in any way
make any observations or sketches of anything you may see
or hear of, but adhere strictly to the duties of your ship," and
observe the same precautions off Santiago. In this letter
he also instructs him not to allow any provisions to leave the
ship, or to do anything which could be interpreted as a breach
of faith in being allowed to pass the blockade and enter the
ports. While this letter doubtless tends to show good faith on
the part of Mr. Forwood, still it was written with full infor-
mation from Mr. Solis that the consul had refused to give him
a passport, without permission from the American authorities
in Washington. That Mr. Forwood recognized the necessity
of an authority from Washington in order to pass the blockade
is shown by his letter to Captain Walker of May 21, 1898, in
reference to one of the voyages to Cienfuegos, in which he
says: "In giving this letter to the blockade, be sure and ask

the officer if he would allow the ship to pass another voyage without cabling to Washington."

From all the testimony in the case it appears very clear:

That Guantanamo was actually and effectively blockaded by orders of Admiral Sampson from June 7 until after the capture of the Adula;

That the Adula was chartered to a Spanish subject for a voyage to Guantanamo, Santiago or Manzanillo, for the purpose of bringing away refugees, and that such voyage was primarily, at least, a commercial one for the personal profit of the charterer. During such charter she was to a certain extent, *pro hac vice,* a Spanish vessel, and a notice to Solis of the existence of the blockade was a notice to the vessel. *The Ranger,* 6 C. Rob. 126; *The Yonge Emilia,* 3 C. Rob. 52; *The Napoleon,* Blatch. Prize Cases, 296. The fact of her sailing under a Spanish passport — in fact, an enemy's license — is not devoid of significance. Indeed, we have in several cases regarded this as sufficient ground for condemnation. *The India,* 8 Cranch, 181; *The Aurora,* 8 Cranch, 203; *The Hiram,* 1 Wheat. 440; *The Ariadne,* 2 Wheat. 143. This passport gave the Adula authority to enter the Cuban ports and take away refugees, and it is a circumstance worthy of notice that it could not be found when the vessel was captured. Solis acknowledged its existence, but made no effort to account for its loss;

Both Solis himself and the Adula had been previously engaged in similar enterprises to the coast of Cuba, and were chargeable with notice, not only of war between the United States and Spain, but with the fact of military and naval operations upon the southern coast of Cuba;

The fact of such war, that the object of it was the expulsion of the Spanish forces from Cuba, and that military and naval operations were being carried on by us with that object in view, must have been matters of common knowledge in Kingston, as well as the fact that the commerce with the southern ports of Cuba was likely to be interrupted, and that all intercourse with such ports would become dangerous in consequence of such war;

While the mission of the Adula was not an unfriendly one

to this Government, she was not a cartel ship, privileged from capture as such, but one employed in a commercial enterprise for the personal profit of the charterer, and only secondarily, if at all, for the purpose of humanity. Her enterprise was an unlawful one, in case a blockade existed, and both Solis and the master of the Adula were cognizant of this fact. The direction of the commanding officer of the Vixen, which overhauled the Adula off Guantanamo, to enter the harbor, cannot be construed as a permission to violate the blockade, as such permission would not be within the scope of his authority. *The Hope*, 1 Dod. 226; *The Amado*, Newb. 400; *The Joseph*, 8 Cr. 451; *The Benito Estenger, post* 568.

That upon arrival off Santiago the blockading fleet was plainly visible, and we think there is a preponderance of evidence to the effect that both Solis and the master of the Adula knew of the actual blockade, that it was generally known in Kingston before she sailed, and that the Adula was chargeable with a breach of it, notwithstanding the letter of instructions from Mr. Forwood to Captain Yeates. As the blockade had been in existence since June 7, it is scarcely possible that, in the three weeks that elapsed before the Adula sailed, it should not have been known in Kingston, which was only a day's trip from the southern coast of Cuba, and with which it appears to have been in frequent communication. This probability is confirmed by the direct testimony of the sailor Morris, that it was matter of common talk in Kingston. The testimony of Solis, that he did not know "officially" that Guantanamo was blockaded, by which we are to understand that it had not been officially proclaimed, is perfectly consistent with a personal knowledge of the actual fact. His statement seems to be little more than a convenient evasion. Upon the principle already stated his knowledge was the knowledge of the ship.

We think the facts herein stated outweigh the general statement of the officers that they had not heard of the blockade.

3. There was no error in denying the motion of the claimant to take further proofs. It appears from the opinion of the court that "the hearing upon the proceedings for condemnation was upon the evidence afforded by the examination of the

captured crew taken upon standing interrogatories, the ship's papers, and other evidence of a documentary character found upon the ship by the captors. This was done in conformity to the established rule in prize causes."

The motion to take further proof was made upon the affidavit of Robert Gemmell, the New York agent of the company, the statement of W. P. Forwood, the Kingston agent, annexed thereto, as well as his own affidavit and exhibits, and upon the counter testimony of Anderson, Ellenberg and Gill taken *de bene esse.* Upon the hearing of this motion the court considered the allegations of Forwood, attached to Gemmell's affidavit, as if Forwood had testified upon depositions regularly taken, giving due weight to the same in connection with other evidence in the case; and was of opinion that the evidence as it stood was not susceptible of any satisfactory explanation; and comparing the proof proposed to be brought forward with that already in the case, came to the conclusion that the legal effect of the facts before the court could not be varied by the explanation offered. The motion was denied. In considering this case we have also given effect to these affidavits, and have come to the conclusion that, if they are to be taken as true, and the further proofs, if taken, would support them, they would not change our opinion with respect to the affirmance of the decree.

If an examination of the ship's papers and of the crew, taken *in preparatorio,* upon which the cause is first heard in the District Court, make a case for condemnation, the order for further proof is, as stated in *The Gray Jacket,* 5 Wall. 342, 368, always made with extreme caution, and only where the interests of justice clearly require it. If the ship's papers and the testimony of the crew do not justify an acquittal, it is improbable that a defence would be established by further proof; and as the interest of all parties require that prize causes be quickly disposed of, it is only where the testimony *in preparatorio* makes a case of grave doubt, that the court orders the taking of further proofs. *The Pizarro,* 2 Wheat. 227; *The Amiable Isabella,* 6 Wheat. 1, 77; Benedict's Adm'y, sec. 512 *a;* Story on Prize Courts, 17.

It was said by Sir William Scott in *The Sarah*, 3 C. Rob. 330, that "it has seldom been done except in cases where there has appeared something in the original evidence, which lays a suggestion for prosecuting the inquiry farther. In such case the court has allowed it; but when the matter is foreign, and not connected with the original evidence of the cause, it must be under very peculiar circumstances indeed that the court will be induced to accede to such an application; because, if remote suggestions were allowed, the practice of the court would be led away from the simplicity of prize proceedings, and there would be no end to the accumulation of proof that would be introduced in order to support arbitrary suggestions."

These remarks are specially pertinent to the offer of further proof that, while Solis owed allegiance to the Queen of Spain, yet, that he left Cuba soon after the war broke out, took no part in the hostilities, but on the contrary had done all in his power while he remained in Cuba to assist citizens of the United States residing there; had sided with the natives of Cuba, and was desirous that a government should be established in the island under the auspices of the United States. As was observed in the very satisfactory opinion of the District Judge in this case, this evidence was altogether irrelevant to the case of the Adula, and was, to a certain extent, a contradiction of his testimony before the prize commissioners that he was a loyal subject of Spain, bore a Spanish passport, and carried a bill of health *viséd* by the Spanish consul at Kingston. It would throw the whole practice in prize cases into confusion if the testimony, taken *in preparatorio*, when the facts are fresh in the minds of the witnesses, were subject to be contradicted by the same witnesses after its weak points had been developed. It was said by Mr. Justice Story in *The Pizarro*, 2 Wheat. 227: "Nor should the captured crew have been permitted to be reëxamined in court. They are bound to declare the whole truth upon the first examination; and if they fraudulently suppress any material facts, they ought not to be indulged with an opportunity to disclose what they please, or to give color to their former statements after counsel has been taken, and they know the pressure of the cause. Public policy and justice

equally point out the necessity of an inflexible adherence to this rule."

Upon the whole, we think the decree of the District Court was correct, and it is therefore

*Affirmed.*

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE GRAY, MR. JUSTICE WHITE and MR. JUSTICE PECKHAM, dissenting.

I cannot concur in the judgment of the court in this case, and shall state my views briefly, without entering at length upon a discussion in support of them.

By a joint resolution of the Senate and House of Representatives of the United States, approved April 20, 1898, it was declared "That the people of the Island of Cuba are, and of right ought to be, free and independent." "That it is the duty of the United States to demand, and the Government of the United States does hereby demand, that the Government of Spain at once relinquish its authority and government in the Island of Cuba, and withdraw its land and naval forces from Cuba and Cuban waters." "That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States to such extent as may be necessary to carry these resolutions into effect." "That the United States hereby disclaims any disposition or intention to exercise sovereignty, jurisdiction or control over said island except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the island to its people." 30 Stat. 738.

By an act approved April 25, 1898, Congress declared "That war be, and the same is hereby, declared to exist, and that war has existed since the twenty-first day of April, A.D. 1898, including said day, between the United States of America and the Kingdom of Spain." 30 Stat. 364, c. 189.

On April 22, a blockade of the north coast of Cuba between Cardenas and Bahia Honda, and of Cienfuegos on the south

coast, was declared by the President, and on June 27 the President by proclamation gave notice that the Cuban blockade had been extended to include all the ports on the southern coast between Cape Frances and Cape Cruz. Neither of these proclamations included the port of Guantanamo, nor was any blockade of that port ever proclaimed by the President.

The Adula was a British vessel, and on June 28 she left the British port of Kingston, in the Island of Jamaica, bound, according to the instructions from the agent of the Atlas Steamship Company, the owners, to Captain Yeates, the master of the vessel, directly to the port of Guantanamo. Among the instructions, found on the vessel when she was captured, were the following:

"I enclose herein a copy of the agreement under which your vessel is proceeding on, and on board the ship will be the charterer, to whom I now introduce you, Mr. José R. Solis, and I will ask you to show him every attention on the voyage.

"You will see by a perusal of the agreement that you are on a voyage wholly and solely for the conveyance of refugees from the ports named to Kingston.

"On your arrival at Guantanamo, to which port you will proceed direct, you will find, no doubt, American war ships off the port. You will, when signalled to, stop immediately and communicate to the commanding officer the voyage that you are on, and in fact you can show him these sailing orders, and I do not think that the commanding officer will make any trouble whatever to your continuing the voyage into the port. You must be careful on your arrival there not to interfere or in any way make any observations or sketches of anything you may see or hear of, but adhere strictly to the duties of your ship. At Guantanamo it is likely there may be some difficulty in obtaining a pilot, and if the commanding officer gives you permission to proceed it is just possible that he may be able to tell you where you can obtain the services of a pilot to go in."

On the afternoon of the 29th June the Adula approached the harbor of Guantanamo, and there met the United States war vessel Vixen. It was testified by Captain Yeates before

the prize commission as follows: "We passed one vessel. I think it was the Vixen. He fired a gun. I stopped immediately, and he told me to proceed. He did not stop his engines at all ; just steamed right on by. Captain Forwood told me I should see vessels of war around there. When the Vixen hailed me we were about half a mile from the entrance of the bay, and about four miles from where we anchored." This evidence was not contradicted, and, in respect to the permission to proceed, was corroborated by one of the crew of the Adula.

After the vessel had entered and anchored in the bay she was seized by the Marblehead, a war ship of the United States, which was lying inside the bay, and was sent to Savannah, where, on July 28, a decree of condemnation was entered against her. No goods of a contraband character were on the vessel.

Upon these admitted facts, there was no duly constituted blockade of Guantanamo existing when the Adula sailed for and entered that port.

On the contrary, by the successive Presidential proclamations of blockade, that port was left free and open for the entrance of neutral vessels. Indeed, it may be fairly said that, in the special circumstances of our war with Spain, those proclamations were intended to permit, if not to invite, the continuance of commerce in goods, not contraband, in all the Cuban ports not included within the limits defined. The United States were not carrying on warlike operations against the people of Cuba. They were declared, by the joint resolution of the two houses of Congress, to be free and independent, and the Government of Spain was called upon to relinquish its government, and to withdraw its land and naval forces from Cuba and Cuban waters. It was notorious that great misery and destitution had been caused among the inhabitants by the military operations of the Spanish army in a long and fruitless effort to subdue the revolutionary movement. Indeed, that condition of the people of Cuba was one of the principal inducements to the United States to intervene on their behalf.

It may be well here to refer to the message of the President

to Congress, of the date of April 11, 1898, wherein will be found the following statements:

"Our people have beheld a once prosperous community reduced to comparative want, its lucrative commerce virtually paralyzed, its fields laid waste, its mills in ruins, and its people perishing by tens of thousands from hunger and destitution. . . . The policy of devastation and concentration, inaugurated by the Captain General's bando of October 21, 1896, in the province of Pinar del Rio, was thence extended to embrace all of the island to which the power of the Spanish arms was able to reach by occupation or by military operations. The peasantry, including all dwelling in the open agricultural interior, were driven into the garrison towns or isolated places held by the troops."

And, after reciting the fact that he had made an appeal to the American people to furnish succor to the starving sufferers in Cuba, the President concluded:

"In view of these facts and of these considerations I ask the Congress to authorize and empower the President to take measures to secure a full and final termination of hostilities between the Government of Spain and the people of Cuba, and to secure in the island the establishment of a stable government, capable of maintaining order and observing its international obligations, insuring peace and tranquillity and the security of its citizens as well as of our own, and to use the military and naval forces of the United States as may be necessary for these purposes. And in the interest of humanity and to aid in preserving the lives of the starving people of the island, I recommend that the distribution of food and supplies be continued, and that an appropriation be made out of the public treasury to supplement the charity of our citizens."

The policy of our Government, in respect to the rights of neutrals, was further made to appear in the President's proclamation of April 26, 1898, declaring our adhesion to the rules of the Declaration of Paris, whereby important modifications, in recognition of the rights of neutrals and of principles of humanity, were introduced into international law.

What was more natural, then, than that our Government

would approve all efforts to furnish food to those famishing people, and to aid them in escaping from the seat of war? It appears that the Adula, after the declaration of war, had made several voyages to Cuban ports, with the express permission of the American consul at Kingston; had brought away several hundred refugees, chiefly women and children, and was engaged in a similar errand when seized.

It is, however, claimed that an actual blockade of Guantanamo had been established by Admiral Sampson early in June, which was in existence at the time the Adula entered that port, and that her master had knowledge of such blockade before leaving Kingston.

To declare a blockade effective against neutrals not carrying contraband goods is said by all the authorities to be one of the highest acts of sovereignty, not to be resorted to except for reasons based on well-known principles of modern warfare, and to be proclaimed so as to give full notice to friendly and neutral nations.

As was said by this court, through Mr. Justice Grier, in *Prize cases*, 2 Black, 635, 665: "Neutrals have a right to challenge the existence of a blockade *de facto*, and also the authority of the party exercising the right to institute it. They have a right to enter the ports of a friendly nation for the purposes of trade and commerce, but are bound to recognize the rights of a belligerent, engaged in actual war, to use this method of coercion, for the purpose of subduing the enemy. . . . That the President, as the executive chief of the Government and commander-in-chief of the Army and Navy, was the proper person to make such notification, has not been and cannot be disputed."

So it was held by Sir William Scott, in *The Henrick and Maria*, 1 Rob. 123, 125, that "notification of a blockade is an act of high sovereignty, and not to be extended by those employed to carry it into execution. . . . A declaration of blockade is a high act of sovereignty; and a commander of a King's ship is not to extend it."

"Where a blockade has been declared by the Government, the commander of the blockading squadron has no discretion-

ary power to extend its limits. If he prohibits neutral ships from entering ports not embraced in the terms of the blockade he was appointed to enforce, the warning is illegal, and no penalty is incurred by the neutral master by whom it is disregarded." 1 Duer Ins. 647, sec. 23.

"A declaration of blockade is a high act of sovereignty, and it is usually made directly by the government to which the blockading squadron belongs. A blockade is however in some cases declared by an officer of a belligerent power, and when so declared it will affect the subjects of neutral nations as far as it is authorized, or adopted and ratified, by his government. The implied authority in this respect vested in a naval commander is much greater at a distance from his government than when he is near it. To affect neutral nations, it must be laid by competent authority, and they are affected only in the extent to which it is so laid." 1 Phillips on Insurance, 466.

As it does not appear that the Government delegated any authority to Admiral Sampson to declare a blockade of the port of Guantanamo, but declared a limited and specified blockade of portions of the Cuban coast by Presidential proclamation, leaving the port in question free and open to neutral commerce, in goods not contraband, it follows that for Admiral Sampson to declare a blockade of such port would have been, on his part, an effort to defeat the policy of his Government, which, as we have seen, was shown, by the proclamations and messages of the President, to have intended to leave open a large portion of the Cuban coast, and ports included therein, to neutral and friendly commerce, designed to furnish food to our starving allies, and to enable their women and children to flee from the oppression under which they were suffering.

Moreover, it does not appear that Admiral Sampson claimed or exercised any right to declare a blockade of Guantanamo. Doubtless he occupied that bay and its adjacent waters with his war vessels, and that gave him a right to visit and search even neutral vessels, to discover whether they carried contraband goods. But this did not warrant any vessel of his

squadron to seize a neutral ship, not carrying contraband goods, when entering a port in effect left free by the proclamation of the President.

But, even if it were conceded that the American commander could establish, without proclamation, a valid actual blockade of the port in question, it would still be true, in my opinion, that the seizure of the Adula was contrary to well-established principles of international law.

When a blockade of a given coast or port of one belligerent has been declared by the sovereign power of another, all vessels of neutral or friendly nations are thereby supposed to be visited with notice of such blockade, and it has been held that if they sailed for the blockaded port, with the intent to enter it, and approach it for that purpose, they are subject to seizure and condemnation, and that they cannot even approach the blockaded port for the purpose of making inquiries of the blockading vessels, since such liberty might lead to attempts to violate the blockade under pretext of approaching for the purpose of making such inquiries. *The Cheshire*, 3 Wall. 231.

But, in the case of a blockade established by a naval officer, acting upon his own discretion, without governmental proclamation, neutrals are not visited with implied notice of the existence of such a blockade, and they may rightfully sail for such a blockaded port, and if, when approaching it, armed vessels are seen to be in its immediate neighborhood, they may apply to such vessels for information and for leave to enter, without subjecting themselves to capture. The duty of the blockading squadron, if objection exists to permitting neutral vessels to enter, is to warn them off. If, after such warning, the neutral vessels, disregarding it, attempt to enter, they are liable to seizure.

As was said in the case of *The Circassian*, 2 Wall. 135, 150, which was a case where the blockade had been proclaimed by the American government: "There is a distinction between simple and public blockades which supports this conclusion. A simple blockade may be established by a naval officer, acting upon his own discretion, or under direction of superiors, without governmental notification; while a public blockade is

not only established in fact, but is notified, by the government directing it, to other governments. In the case of a simple blockade the captors are bound to prove its existence at the time of capture; while, in the case of a public blockade, the claimants are held to proof of discontinuance in order to protect themselves from the penalties of attempted violation. The blockade of the rebel ports was and is of the latter character. It was legally established and regularly notified by the American government to the neutral governments. Of such a blockade, it was well observed by Sir William Scott: 'It must be conceived to exist till the revocation of it is actually notified.' The blockade of the rebel ports, therefore, must be presumed to have continued until notification of discontinuance."

In *Fitzsimmons* v. *Newport Ins. Co.*, 4 Cranch, 185, 198, it was held that the fact of clearing out for a blockaded port is, in itself, innocent, unless accompanied by other incidents; that the offence consists in persisting in attempting to enter the interdicted port after having been warned; and it was said by Chief Justice Marshall:

" The right to treat the vessel as an enemy is declared by Vattel to be founded on the attempt to enter, and certainly this attempt must be made by a person knowing the fact. But this subject has been precisely regulated by the treaty between the United States and Great Britain, which was in force when this condemnation took place. That treaty contains the following clause:

" ' And whereas it frequently happens that vessels sail for a port or place belonging to an enemy, without knowing that the same is either besieged, blockaded or invested, it is agreed that every vessel so circumstanced may be turned away from such port or place, but she shall not be detained, nor her cargo, if not contraband, be confiscated, unless, after notice, she shall again attempt to enter; but she shall be permitted to go to any other port or place she may think proper.'

" This treaty is conceived to be a correct exposition of the law of nations; certainly it is admitted by the parties to it, as between themselves, to be a correct exposition of that law, or

to constitute a rule in the place of it. Neither the law of nations nor the treaty admits of the condemnation of the neutral vessel for the intention to enter a blockaded port, unconnected with any fact."

The distinction between a blockade declared by a government and a blockade *de facto* is thus stated by Chancellor Kent:

"A notice to a foreign government is a notice to all the individuals of that nation; and they are not permitted to aver ignorance of it, because it is the duty of the neutral government to communicate the notice to their people.

"In the case of a blockade without regular notice, notice in fact is generally requisite; and there is this difference between a blockade. regularly notified, and one without such notice, that, in the former case, the act of sailing for the blockaded port, with the intent to evade it, or to enter it contingently, amounts, from the very commencement of the voyage, to a breach of the blockade; for the port is to be considered as closed up, until the blockade be formally revoked, or actually raised; whereas, in the latter case of a blockade *de facto*, the ignorance of the party as to its continuance may be received as an excuse for sailing to the blockaded place, on a doubtful and provisional destination."

It should be noted that the American cases cited, on behalf of the captors, to the effect that sailing from a neutral port to a blockaded port is, in itself, a violation of the blockade, were cases in which there had been a Presidential proclamation, of which neutral vessels were bound to take notice. *The Circassian*, 2 Wall. 135; *The Admiral*, 3 Wall. 603.

It should further be considered that in the President's proclamation of April 22, 1898, establishing the extent of the blockade, there was contained the following provision:

"Any neutral vessel approaching any of said ports, or attempting to leave the same, without notice or knowledge of the establishment of such blockade, will be duly warned by the commander of the blockading forces, who will indorse on her register the fact, and the date, of such warning where such instrument was made; and if the same vessel shall again

attempt to enter any blockaded port she will be captured and sent to the nearest convenient port for such proceedings against her and her cargo as prize, as may be deemed advisable." 30 Stat. 1769.

Of course, if the blockade of Guantanamo was illegal, as inconsistent with the terms and intent of the President's proclamations, no consideration of the evidence regarding the movements of the vessel is called for, and it is a clear case for restitution. In such a case, no importance can be ascribed to any supposed notice to the owners of the ship. The Admiral's want of power to override the policy and intentions of the Government cannot be supplied by imputing to the vessel a knowledge of an actual occupation of the port by armed vessels of the United States. Such occupation would be no reason why neutral ships, not carrying contraband cargo, might not fearlessly approach and enter the harbor.

If, however, the other view be taken, namely, that it was competent for the Admiral, of his own motion, to establish a blockade, still, as we have seen, neutral vessels were entitled, on principle and authority, to a warning by the blockading squadron, and could only become lawful prize by disregarding the warning, and renewing the attempt to enter. Mere knowledge by the neutral vessel that vessels of war occupied the harbor and adjacent waters would not constitute notice or knowledge of a blockade; she would be entitled to an actual warning. *Maryland Ins. Co.* v. *Woods*, 6 Cranch, 29.

The Adula received no such warning. When she approached the harbor she was hailed by a war vessel, the Vixen, and was told to proceed. If, by telling the Adula to proceed, the commander of the Vixen is to be understood as taking charge of the Adula as engaged in an attempt to break the blockade, there was, of course, no warning. If, what seems the natural import of the language, the commander of the Vixen gave the neutral vessel permission to enter the harbor, not only was there no warning, but such permission protected her from the subsequent seizure after she had entered and anchored in the harbor.

But it is contended that the Adula had actual knowledge of the existence of the blockade when she sailed from Kingston, and that such knowledge deprived her of the right to a warning.

As already said, if the blockade had been regularly proclaimed by the United States government, the Adula, as a neutral vessel, if aware of the blockade, could not lawfully have sailed from Kingston and approached Guantanamo with an intention to enter it unless intercepted. It is well settled that, in the case of a proclaimed blockade, the neutral vessel may not, with a knowledge of the proclamation, approach the prohibited port, even for the purpose of inquiring from the vessels in occupation whether the blockade was still in existence. The reason given for such a decision is that it would seriously affect the efficiency of the blockade if ships were permitted to approach the blockaded port on pretext of inquiry, and thus be enabled to slip in if there was a momentary absence of a blockading vessel.

But different principles prevail in the case of a blockade de facto. Then, neutral vessels may, even with knowledge that such a blockade had been in existence, sail for such port with a clear right to inquire whether the blockade was still in force, and to enter the port if it is found not to be actually blockaded. The reason for the distinction, given in the authorities, is that a proclaimed blockade is deemed to continue until the blockade is raised by a declaration of the power that established it. But a simple or de facto blockade lasts only so long as the blockading squadron chooses to maintain it by a present and actual force. The reasons for constituting such a blockade may cease at any time, and a neutral vessel, on a peaceful voyage, and not carrying a contraband cargo, may lawfully sail for such a port, and, if when she reaches it the blockade continues, is entitled to a warning.

Thus far it has been assumed that the Adula had actual knowledge of the blockade when she sailed from Kingston, and it has been shown that, in the case of a blockade of the character that this one is claimed to have been, namely, one created by and depending on the will of the commander of

the fleet, the neutral was entitled to a warning, whether she had or not previous information that a blockade had existed some time before.

But, in point of fact, as I read the evidence, the Adula had not such previous knowledge, but approached Guantanamo Bay, within the terms of the President's proclamation, without notice or knowledge of the establishment of a blockade, and was therefore entitled to be "duly warned by the commander of the blockading forces."

Captain Yeates, Purser Williamson and Solis testified in direct terms that they had no knowledge or information before sailing that Guantanamo was blockaded. The only testimony to the contrary was that of Morris, a colored seaman, who said that about three days before he left Kingston he heard that Guantanamo was blockaded. He does not give the source of his information, or pretend that he made known the matter to the owners or to the officers of the vessel. Probably all he meant was that he had heard that the United States fleet was at Guantanamo. The other facts plainly corroborate the captain's testimony. Consider the direction contained in the instructions given the captain, and shown in the record: "On your arrival at Guantanamo, to which port you will proceed direct, you will find, no doubt, American war ships off the port. You will, when signalled to, immediately stop and communicate to the commanding officer the voyage you are on, and, in fact, you can show him these sailing orders, and I do not think that the commanding officer will make any trouble whatever to your continuing the voyage into the port. . . . At Guantanamo it is likely there may be some difficulty in obtaining a pilot, and if the commanding officer gives you permission to proceed it is just possible that he may be able to tell you where you can obtain the services of a pilot to go in." Such instructions are not consistent with knowledge, on the part of the general agent who gave them, that a blockade was actually in force, nor with any intention to violate it.

So, too, the conversation that Solis, the charterer, had with the United States consul at Kingston, in which he sought to

obtain a passport for the voyage, and in which he informed the consul of the object of the voyage, and of his intention to ask permission of the American Admiral to enter the port, shows that no clandestine or improper voyage was intended. A person designing to violate a blockade assuredly would not inform the consul of the nation whose vessels were maintaining the blockade of the time and circumstances of his voyage.

Solis further testified that he first heard of the blockade on the Adula on June 28; that he then heard that on the 27th there was issued an order of the President of the United States declaring a blockade, etc. But as it is not pretended that the President had issued any such proclamation, it is evident that Solis was speaking of a mere rumor; and he immediately added: " I understood Guantanamo was not declared officially blockaded, although there were some vessels there. I got that information from newspapers in Kingston and from those newspapers I got the information that marines had been landed at the entrance to the bay on the east side."

It is stated, in the opinion of the majority, that the American consul warned Mr. Forwood, the agent of the ship at Kingston, of the existence of the blockade. This statement is based on Forwood's recital of what passed between the consul and himself, in the following language: " Well, Forwood, I would not advise you to let the ship go. They won't let her into Guantanamo, and they will be watching for her." So far from this language importing a notification of an existing blockade, it rather implies the contrary — that the voyage would be fruitless because the consul believed that the ship would not be allowed to enter the destined port. It certainly cannot be regarded as an official notice of an existing blockade, as is claimed in the argument for the captors. The consul was right, in the existing circumstances, in declining to give the permit desired; but he had no power to declare a port to be in blockade, nor did he pretend to do so.

So far, therefore, as respects the matters urged as evidence, that the Adula, her owners, master or charterer knew, or had any good reason to believe, that, at the time she sailed, there

was an existing blockade of the port of Guantanamo, they seem to me to be "trifles light as air."

What this court said, through Mr. Justice Grier, in the *Prize cases*, 2 Black, 635, may well be repeated here:

"All reasonable doubts shall be resolved in favor of the claimants. Any other course would be inconsistent with the high administration of the law, and the character of a just government."

Some make-weights are attempted to be thrown into the scales by adverting to the fact that Solis had passports from the Spanish consul, and the following cases are cited in the majority opinion: *The Julia*, 8 Cranch, 181; *The Aurora*, 8 Cranch, 203; *The Hiram*, 1 Wheat. 440, and *The Ariadne*, 2 Wheat. 143.

The case of *The Julia* was thus stated by Mr. Justice Story:

"It is sufficient to declare that we hold that the sailing on a voyage under the license and passport of protection of the enemy in furtherance of his views or interests, constitutes such an act of illegality as subjects the ship and cargo to confiscation as prize of war."

Surely; but in the present case there was no license or passport of protection for the voyage in furtherance of the views and interests of the enemy, but the obnoxious instrument was a personal passport to Solis, dated April 13, 1897, more than a year before the war, in the following terms: "Don José R. Solis Velasquez, native of Santiago de las Vegas, province of Havana, by profession a merchant, dwells in Marina street, No. —, and resides habitually in that ward and at that number." Were these personal passports, one given long before the war and the other a mere permission to enter cities on the island, at all similar to the case of *The Julia*, where, as the opinion in that case shows, "The master was a part owner of the vessel and cargo, and the regular depository of all the *papers connected with the voyage.* It is utterly incredible that he should not recollect, in his examination, the existence of these British documents. They were put on board for the *special safeguard and security of the vessel and cargo.*"

In the case of *The Aurora*, a formal passport or permit had

been given by the British consul to " the American ship Aurora, William Augustus Pike, master, burthen 257 tons, now lying in Newburyport, etc., . . . requesting all officers commanding his majesty's ships of war, or private armed vessels belonging to subjects of his majesty, not only to suffer the said Aurora to pass without molestation, but also to extend to her all due assistance and protection in the prosecution of her voyage to the West Indies," etc. The judgment of the court was thus stated : " The acceptance and use of an enemy's license on a voyage to a neutral port, prosecuted in furtherance of the enemy's avowed objects, is illegal, and subjects vessel and cargo to confiscation."

In the case of *The Hiram*, the vessel was sailing under protection of an enemy's license to the vessel, and this was held to have been in principle an offence of trading with the enemy. In the case of *The Ariadne*, the vessel was sailing with a license or passport of protection from the enemy's admiral.

It is scarcely necessary to say that a personal passport given to Solis, a Cuban, more than a year before the war, cannot be regarded as intended as a passport or protection to a British vessel, sailing under a British flag, on an errand friendly to the United States and their allies. And as respects the permission Solis had obtained from the Spanish consul to enter the cities to which he was bound, " and take passengers, refugees," such permission was in furtherance of humanity and not of any warlike object or interest.

The conclusions reached may be summarized thus :

(1) The port of Guantanamo was intentionally and as matter of policy left open and free to neutral commerce, not contraband, by the President's proclamations, and the Adula had a clear right to sail for and enter that port, even if aware that war vessels of the United States were in occupancy of the port. Such war vessels would, of course, have a right to prevent the Adula from entering the port if such entry would interfere with any military operation in hand.

(2) It was not competent for the commander of the fleet to extend the proclaimed blockade so as to include a port exempted by the President's proclamation, and to thus make prize

of war a neutral vessel approaching such port on a peaceful errand.

(3) If an immediate exigency — and none such is shown to have existed in the present case — justified the Admiral of the United States in prohibiting the entrance of neutral vessels, sound principles of international law required that such vessels should be warned on approaching the port, and they could not be seized as lawful prize, unless they disregarded the warning and attempted again to enter.

This is no time, in the history of international law, for the courts of the United States, in laying down rules to affect the rights of neutrals engaged in lawful commerce, to extend and apply harsh decisions made a hundred years ago, in the stress of the bitter wars then prevailing; when the rights of the comparatively feeble neutral states were wholly disregarded. Still less should our courts, as it seems to me was done in this case by the District Court, adopt strained and unnatural constructions of facts and circumstances, in order to subject vessels of nations with whom we are at peace to seizure and condemnation.

I am authorized to say that MR. JUSTICE GRAY, MR. JUSTICE WHITE and MR. JUSTICE PECKHAM concur in this dissent.