THE CHESHIRE.

1. The property of a commercial house, established in the enemy's country, is subject to seizure and condemnation as prize though some of the partners may have a neutral domicile.
2. The approach of a vessel to the mouth of a blockaded port for inquiry— the blockade having been generally known—is itself a breach of the blockade, and subjects both vessel and cargo to condemnation.

DURING the Southern rebellion, and our proclamation of a blockade of Savannah and other parts of the Southern coast being then notorious to the world, the ship Cheshire, with a miscellaneous and assorted cargo, was captured by a war steamer of the United States, on the 6th of December, 1861, off Savannah bar, eight or nine miles eastward of Tybee Light. She was taken to the port of New York and there libelled in the District Court as prize of war.

The evidence showed that the ship had been built in the State of Maine in 1848, her American name having been the Monterey; that she was owned by a house residing and doing business in Savannah, and was employed in the cotton trade to Liverpool; that in May, 1861, after the port of Savannah had been closed by the blockade set on foot under the President's proclamation of April 19, 1861, that house made a sale of her to Joseph Battersby, of *Manchester*, England; that her name was then changed, and in June, 1861, that she broke the blockade of Savannah, carrying a cargo of cotton to Liverpool.

Joseph Battersby, the purchaser, and who claimed her

here, was then and at the time of the capture, a partner in business with William Battersby in *Savannah*, where one of them resided, the name of the firm being the same as that of their Manchester house, William Battersby & Co.

The *cargo* was claimed by both the Battersbys.

The ship was loaded at Liverpool and sailed directly for Savannah. The captain, however, had received instructions at Liverpool, dated October 8, 1861, "to call off Savannah *merely for the purpose of inquiry*, but on *no account whatever* to attempt to enter a blockaded port." "In case the blockade is not raised proceed to *Nassau*, N. P., and *remain until you receive orders from Messrs. William Battersby & Co., of Savannah.*" The claim made in the case stated that this contingent destination to Savannah had been made in consequence of confident predictions, well known, by high officers of our government, that the rebellion would speedily be quelled; and of the consequent presumption by the owners of the vessel and cargo, that the blockade would probably be raised by the time the vessel reached our Southern coast.

Some of the papers showed that Halifax, N. S., was a possible port of destination. The shipping articles represented the voyage as " from Liverpool to Halifax, N. S., or Nassau, N. P.," &c. The receipt of the shipping-master of the port of Liverpool for fees, dated 30th of September, 1861, declared it for Halifax. The master swore: " On the voyage during which we were captured, the Cheshire was bound from Liverpool to Halifax, Nova Scotia, or Nassau. I was to speak the blockading squadron, and *if the ports were blockaded*, I was to go to Nassau, or Halifax."

None of the papers of the ship, neither the clearance, bills of lading, invoices, nor manifest, which declared the ship bound for Nassau, nor the shipping articles, which declared her bound for Halifax or Nassau, contained the slightest intimation of a purpose under any circumstances to enter the port of Savannah.

The District Court, after argument and full consideration, condemned both vessel and cargo, on the ground that they were enemy's property and were captured in attempting to

break the blockade of the port of Savannah.   On appeal to the Circuit Court the condemnation was affirmed, and the case was now brought by the claimants before this court for review.

*Mr. Edwards, for the claimants, appellants in the case; Mr. Assistant Attorney-General Ashton, and Mr. Coffey, special counsel, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The facts established by the evidence in this case justify the condemnation, we think, of the cargo as enemy's property.   No principle is more firmly settled than that the property of a commercial house, established in the enemy's country, is subject to seizure and condemnation as prize without regard to the domicile of the partners.   The trade of a house of this kind is essentially a hostile trade, and the property employed in its prosecution is therefore treated as enemy's property, though some of the partners may have a neutral domicile.*   Such trade tends directly to add to the resources and revenues of the enemy, and, as observed by Mr. Justice Story, " there is no reason why he who thus enjoys the protection and benefits of the enemy's country should not, in reference to such a trade, share its dangers and losses.   It would be too much to hold him entitled, by a mere neutral residence, to carry on a substantially hostile commerce, and at the same time possess all the advantages of a neutral character."†

In this view it is unimportant whether the cargo was to be delivered to agents at Nassau, subject to the order of the house at Savannah, or be delivered directly from the Cheshire in the port of Savannah.   In either case there was the trade with the house situated in the enemy's country.

The evidence in the case also establishes, we think, with equal clearness, the fact that the ship was attempting to break the blockade when captured.   She was loaded for

---

* The Friendschaft, 4 Wheaton, 107.
† The San Jose Indiano and Cargo, 2 Gallison, 284.

Savannah; her cargo was intended for the branch-house of the shippers; she sailed directly for that port; the owners and officers of the ship were informed of the existence of the blockade before leaving Liverpool; and there was no act of our government, nor any act of the British government, nor had any event occurred in the progress of the war, from which any inference could be drawn that the blockade had ceased. The instructions to call off Savannah merely for the purpose of inquiry, and to proceed thence to Nassau upon ascertaining that the blockade was in force, have, under these circumstances, the appearance of a device to cover up a settled purpose to elude the blockade. They create a strong impression to that effect, and this impression is strengthened by an examination of the ship's papers. These papers contain no intimation of an intention to enter the port of Savannah upon any contingency. They show the destination of the ship to be either Nassau or Halifax; they indicate no contingent intention of going anywhere else. This concealment of the truth is itself a circumstance calculated to awaken strong suspicion as to the real designs of the ship; it is, in fact, *prima facie* evidence of fraudulent intention.

In the case of *The Carolina*,\* where a cargo was taken on a voyage from Bayonne, ostensibly to Altona, but, in fact, to Ostend, the ship's papers represented that the cargo was to be delivered at Altona and Hamburgh; and the court said, that if there had been any fair contingent, deliberative intention of going to Ostend, that ought to have appeared on the bills of lading; for it ought not to be an absolute destination to Hamburgh if it was at all a question whether the ship might not go to Ostend, a port of the enemy, and that there was in this a fraudulent concealment of an important circumstance which ought to have been disclosed. Of the same purport are all the authorities.†

---

\* 3 Robinson, 75.

† See The Margaretta Charlotte, Id. 78, note 1; The America, Id. 36; The Neptunus, Id. 80; The Nancy, Id. 82; The Phœnix, Id. 186.

Aside from these considerations the intention to break the blockade is to be presumed from the position of the ship when captured. As already stated, she knew of the blockade when she sailed from Liverpool; she had no just reason to suppose it had been discontinued; her approach, under these circumstances, to the mouth of the blockaded port for inquiry was itself a breach of the blockade, and subjected both vessel and cargo to seizure and condemnation. The rule on this point is well settled, and is founded in obvious reasons of policy. If approach for inquiry were permissible it will be readily seen that the greatest facilities would be afforded to elude the blockade; the liberty of inquiry would be a license to attempt to enter the blockaded port; and that information was sought would be the plea in every case of seizure. With a liberty of this kind the difficulty of enforcing an efficient blockade would be greatly augmented. If information be honestly desired, it must be sought from other quarters. In the case of the *James Cooke*,* the ship was captured at the entrance of the Texel, and the court applied this rule, observing that the approach of the ship to the mouth of a blockaded port, even to make inquiry, was, *in itself*, a consummation of the offence, and amounted to an actual breach of the blockade.

In every view, therefore, in which this case can be considered, we are of opinion that the ship and cargo were rightly condemned; and we, therefore, affirm the

DECREE OF CONDEMNATION.

[See, as to the second point of this case—inquiry at a blockaded port— *supra*, p. 84, *The Josephine*.—REP.]

---

* Edwards, 263.