BALFOUR, GUTHRIE & CO. v. PORTLAND & ASIATIC S. S. CO.

(District Court, D. Oregon. February 8, 1909.)

No. 4,791.

1. WAR (§ 19*)—BLOCKADE—ESTABLISHMENT AND DURATION.

A proclamation by one of two nations engaged in war declaring a blockade of the enemy's ports does not affect the right of a neutral to enter such ports unless the blockade is made effective in fact.

[Ed. Note.—For other cases, see War, Cent. Dig. § 96; Dec. Dig. § 19.* The neutrality laws, see note to Hart v. United States, 28 C. C. A. 622.]

2. SHIPPING (§ 108*)—CARRIAGE OF GOODS—CONTRACT OF AFFREIGHTMENT.

Libelant was a shipper of flour from Portland. Oregon, to Asiatic ports by respondent's line of steamships, the custom being for it to reserve space on a vessel for a certain tonnage, the ports of destination not being designated until the vessel was loaded when bills of lading were issued containing the specific contract including a provision that the carrier should not be liable for loss or damage occasioned "by arrest or restraint of princes, rulers, or people." Following such method of dealing, by a writing made Aug. 1, 1904, space was reserved for libelant for 2,000 tons of flour on a steamship of respondent sailing Aug. 28, on her regular voyage for Japanese and Chinese ports. Russia and Japan had been for some months at war and Russia had issued a proclamation declaring flour contraband of war. Russia had not established any effective blockade of Japanese ports but her war vessels had seized some neutral vessels as prizes, including one owned by respondent, the cargo of which was condemned. Respondent continued to operate its vessels however and both parties knew of such seizure as well as the general war conditions when the reservation of space was made. A day or two later the agreement was canceled by respondent as to shipments to any Japanese ports on the ground of the war conditions. *Held* that in view of the previous method of dealing between the parties the reservation of space by agreement amounted to a contract by implication to carry flour to any regular port of call of the vessel in Japan which should be designated by libelant at the time of loading, subject to the limitation of liability contained in the usual bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 405; Dec. Dig. § 108.*]

3. WAR (§ 18*)—CONTRABAND—FLOUR.

While flour is not in general contraband of war it may be so if intended for military use by a belligerent or destined for a port of military or naval equipment, and being thus on the border line a proclamation of one of the governments at war declaring it contraband is sufficient to impress it with that character.

[Ed. Note.—For other cases, see War, Cent. Dig. § 91; Dec. Dig. § 18.*]

4. WAR (§ 18*)—RIGHTS OF NEUTRALS—VALIDITY OF CONTRACT TO CARRY CONTRABAND.

A citizen of a neutral state may lawfully contract to carry contraband of war and his undertaking will be enforced by the courts of the neutral state.

[Ed. Note.—For other cases, see War, Cent. Dig. § 92; Dec. Dig. § 18.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. SHIPPING (§ 108*)—CARRIAGE OF GOODS—CONTRACT OF AFFREIGHTMENT— LIMITATION OF LIABILITY—"ARREST OR RESTRAINT OF PRINCES, RULERS, OR PEOPLE."

A clause exempting a carrier from liability for loss or damage occasioned "by arrest or restraint of princes, rulers, or people" in a contract of affreightment by a neutral to carry contraband of war, made when conditions of war exist and are known to both parties, must be construed as intended to apply only to actual arrest or seizure and confiscation and affords no ground for repudiation of the contract by the carrier because of the danger of seizure.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 405, 408; Dec. Dig. § 108.*

For other definitions, see Words and Phrases, vol. 1, p. 504.]

In Admiralty.

Williams, Wood & Linthicum, for libelants.

W. W. Cotton and Arthur C. Spencer, for respondent.

WOLVERTON, District Judge.  This is a libel for the recovery of damages for the breach of a contract of affreightment, whereby it is alleged the respondent agreed to carry 1,750 tons of flour from Portland, Or., to Japanese ports.  The breach consists in the refusal of the respondent to carry the flour as agreed.  A dispute arose at the outset whether any contract was ever in fact consummated.  This, together with the controversy following, requires a statement of all negotiations had between the parties relative to the subject.

The respondent was, at the time, engaged in navigating a line of steamers for carrying freight from Portland, Or., to Japanese ports, namely, Yokohama, Kobe, and Moji, and to Hong Kong, China.  Pursuant to previous communications by telephone between representatives of the libelants and respondent, J. W. Ransom, acting for R. B. Miller, who was the general freight agent of respondent, wrote the libelants, on July 30, 1904, as follows:

"Gentlemen: Referring to conversation with Mr. Jones this date. Kindly confirm reservation of space for your account on the Nicomedia about Aug. 28th for 2,000 tons flour. Will advise you later if reservation can be increased."

To this letter the libelants replied, August 1, 1904:

"Dear Sir: Answering yours of 30th ult., we confirm reservation of 2,000 tons space per s. s. 'Nicomedia' to sail hence 28th inst., and now await to hear what further space you can put at our disposal."

On August 2d the respondent wrote canceling the reservation:

"Gentlemen: Confirming telephone advice. Owing to war conditions in the Orient and Russian Government's declaration of food stuffs as contraband, we have been obliged to cancel all engagements of space for shipments destined Japan ports on the Nicomedia Aug. 28th. Understand that 1,750 tons of your 2,000 ton reservation on this steamer is destined Japan, and cancellation of same will leave your total reservation on the Nicomedia 250 tons for Hong Kong. If you can increase your offerings for this port will be pleased to have you do so."

On August 20, 1904, libelants wrote the respondent, as follows:

"Dear Sir: Referring to engagement made with you for 1,750 tons space on 'Nicomedia' for Japan and your subsequent declination to· carry out same, we are advised we have an enforcible contract with you and now call upon you to carry out same, otherwise we will hold you liable for all loss, damage and prejudice that may come to us thereby."

Respondent wrote libelants, August 23d:

"Replying to your letter of August 20th in regard to space on the Nicomedia, I beg to say that on August 2nd, we were compelled to cancel all engagements of space for shipments destined to Japan ports on the Nicomedia, and so informed you on that date."

In libelants' previous negotiations with respondent for space on its · vessels, a definite tonnage was reserved, but the ports of destination were not designated until the ship was ready to receive her cargo. Further than this, when the cargo was aboard, a bill of lading, reciting in specific form the contract of affreightment, was issued to respondent. This form of bill of lading contains a stipulation, as follows:

"It being mutually agreed that the carrier shall not be liable for loss or damage occasioned * * * by arrest or restraint of princes, rulers, or people."

There is practically no disagreement in the evidence touching this method of dealing between the parties. As soon as libelants ascertained that they could secure space for shipment, they sold the flour by cable at port of destination, thus obligating themselves to make delivery thereof in due course of the ship's arrival. In pursuance of their usual custom in this respect, they sold the flour in Japan, designed to be shipped by the steamship Nicomedia, immediately upon securing space for such shipment, as per the written memorandum or agreement between the parties above set out.

The respondent was operating its vessels between Portland, Or.. and Japan and China, at all times during the negotiations for shipment of the flour, and at all such times, and for some time prior thereto, Russia and Japan were and had been at war. Some time in June or early in July, 1904, Russia issued a proclamation declaring flour contraband of war, which continued in force until after the Nicomedia entered upor her intended voyage. Mr. Schwerin testifies that Russia had at that time also "practically notified the world of an active blockade of the Japan coast." Further on, however, he says, referring to the seizure of the Arabia by Russian gunboats:

"We had previously carried flour while the discussion of these questions was going on, because, according to advices I had from Japan, Russia was not maintaining a blockade according to international law, although she had declared Japan's ports blockaded."

Whatever the historical fact may be touching any proclamation of Russia declaring Japan's ports blockaded, the proofs here adduced do not show that any effective blockade of any port of Japan was ever maintained by that country. The most that can be said under the evidence is that the Russian Vladivostok flying squadron was for a time harassing shipping plying to· and from Japanese ports, which squadron

made some seizures of vessels of neutrals as prizes of war. Notably, it is shown that the respondent's steamship Arabia was seized by three Russian cruisers on July 22d, 30 miles off Cape Inuboe, and taken to Vladivostok as a prize of war. Her cargo, consisting of flour and car bodies, was alone condemned, however; the ship being released about a month later. The Calculus, a steamship of the Blue Funnel Line, out of Seattle, was seized about the same time, presumably by the same squadron. The respondent had definite advices of the Arabia's seizure in Portland about the 25th or 26th of July, and very clearly it had such advices prior to writing the letter of July 30th requesting confirmation of space for account of the Nicomedia. It further appears, from Mr. Schwerin's testimony, that the respondent was well advised at the time touching war conditions as they affected shipping to and from Japanese ports. Indeed, he assigns such conditions as a reason why the respondent should not accept further shipments for Japan, and it was through his authority that the alleged contract of affreightment was canceled. The libelants had knowledge of these war conditions also, and knew of the seizure of the Arabia. Mr. Burns, the manager of the libelant company, says, relative to entering into the contract, "We were taking the risk of losing our flour." So that both parties entered into whatever contract was the result of their negotiations with full knowledge of the war conditions affecting shipping on the Japanese coast at the time.

It is first insisted by respondent that no contract to carry flour to Japan on the Nicomedia was consummated, because the reservation of space by the libelants was general, without specification of any ports of delivery. In view of the previous manner of negotiation between the parties, of reserving space generally, and designating the ports of delivery when the ship was ready to receive cargo, I am of the opinion that there was an undertaking, by implication, to carry so much of the cargo for which space was reserved to the Nicomedia's regular ports of call in Japan as the libelants might specify when she was ready to receive cargo. There was no designation of any port of delivery, but it was very well understood that the ship would sail on her accustomed voyage to the Orient on August 28th; her ports of call being Hong Kong, in China, and Yokohama, Kobe, and Moji, in Japan. And so it was that space was reserved for that voyage. The libelants had been shipping to ports in Japan, as well as to Hong Kong, over this line, so that, by the very reservation of space generally, there remained the right or privilege in the libelants to name in due time the ports of delivery for the cargo. Upon like principle, the conditions contained in the usual bill of lading issued by the respondent before sailing days must be regarded, as the respondent contends, as containing the stipulations of the parties; all negotiations being had in anticipation of the issuance of such a paper and its acceptance by the libelants.

There is contention of counsel that the charter party was dissolved by reason of the alleged Russian blockade of Japanese ports; the contention proceeding upon the well-established rule that it is unlawful for a neutral to enter a blockaded port, for which offense the ship

and cargo is subject to seizure and condemnation as good prize. Indeed, the law is so strict that a neutral vessel cannot approach a blockaded port with intent to enter, or even for the purpose of making inquiries of a blockading vessel, without subjecting itself to seizure. The Cheshire, 3 Wall. 231, 18 L. Ed. 175; The Adula, 176 U. S. 361, 20 Sup. Ct. 432, 44 L. Ed. 505. This is according to international law, which applies in prize cases. The inhibition cannot help the respondent, however, as it has not been shown that any blockade existed at the time of the negotiations in question or of the sailing of the Nicomedia. Under none of the authorities does the blockade have the effect claimed for it, unless it be real and effective in fact. See The Spartan (D. C.) 25 Fed. 44. And it has certainly not been proven that any blockade of such character was maintained for any length of time.

The next contention of respondent, strenuously urged, is that the conditions prevailing, namely, the continuance in force of the Russian proclamation declaring flour contraband of war, the presence of the Russian gunboats in the waters off the coast of Japan, and the frequent or occasional seizure of neutral ships and search for contraband, are tantamount to "arrest or restraint of princes," etc., and, therefore, that respondent was warranted under the terms of the contract of affreightment in refusing to carry the flour for which space was reserved. In response to this position, it is urged upon the other side, first, that flour is not contraband of war; and, second, that, the contract having been entered into while the war conditions suggested were prevalent, it became a contract to carry the flour notwithstanding the conditions. This brings up the question whether the contract by a citizen of a neutral to carry contraband of war to citizens of one of the belligerents is void because illegal and contrary to law.

Contraband of war is apparently insusceptible of exact definition as applied to every species of merchandise. For ascertainment of that which may be characterized as contraband, the United States Supreme Court has divided articles of contraband into three classes:

"The first consists of articles manufactured and primarily and ordinarily used for military purposes in time of war; the second, of articles which may be and are used for purposes of war or peace, according to circumstances; and the third, of articles exclusively used for peaceful purposes. Merchandise of the first class, destined to a belligerent country or places occupied by the army or navy of a belligerent, is always contraband; merchandise of the second class is contraband only when actually destined to the military or naval use of a belligerent; while merchandise of the third class is not contraband at all, though liable to seizure and condemnation for violation of blockade or siege." The Peterhoff, 5 Wall. 28, 58, 18 L. Ed. 564.

The rule is perhaps sufficiently accurate in a general way for practical purposes, but much depends, for the appropriate classification of many articles of commerce, upon the peculiar and attendant circumstances of each particular case. This is true, undoubtedly, of that species of commerce denominated "provisions." Mr. Justice Story says that:

"By the modern law of nations, provisions are not, in general, deemed contraband; but they may become so, although the property of a neutral, on ac-

count of the particular situation of the war, or on account of their destination." Citing The Jonge Margaretha, 1 Rob. Adm. 189.

He then continues:

"If destined for the ordinary use of life in the enemy's country, they are not, in general, contraband; but it is otherwise if destined for military use. Hence, if destined for the army or navy of the enemy, or for his ports of naval or military equipment, they are deemed contraband."

To this rule there is an exception "where the provisions are the growth of the neutral exporting country." The Commercen, 1 Wheat. 382, 387, 4 L. Ed. 116.

In the case of The Jonge Margaretha (see 2 Tudor's Leading Cases, *847), the exception is supplemented with the further qualification, "and when they are not prepared for immediate use." It is further laid down in that case that:

"Where articles of provisions are going to a commercial port, the presumption is that they are going there for civil use; contra, if they are going to a port of naval military equipment, and especially if there be a hostile armament then preparing there."

Flour may probably be considered as a provision prepared for immediate use; but as to whether it was designed that the product in the present instance should go to a naval or military equipment station, there is no proof except that Japan was in a state of war. Ordinarily, therefore, the presumption would prevail that the flour was going to Japan for civil use, and would not be contraband except that it was declared to be so by one of the belligerents. Perhaps a mere declaration by a belligerent nation that articles of commerce are contraband, when by the rules of international law they are not, would not make them so. But here is a proclamation touching provisions that rest upon the border line, and depend for their real character upon the particular state of the port of their destination, whether engaged in civil pursuits only, or in the equipping of either the army or the navy with war supplies. It would seem that, under such conditions, the proclamation of one of the governments at war would be effective to impress the provisions with the character of contraband. At any rate, I am inclined so to treat the flour concerned here. The pivotal question, therefore, is, Was there an "arrest or restraint of princes" within the meaning and intendment of the charter party?

Had the charter party been entered into prior to the prevalence of any war conditions affecting Japan and her ports of entry, there could be but little question that the respondent could have legitimately declined to carry the flour. The case of The Styria, 101 Fed. 728, 41 C. C. A. 639, and again decided on appeal to the Supreme Court, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027, is one which upon the facts, save that the contract was entered into before war conditions arose, bears a strong analogy to the present. The Styria was an Austrian steamship, and sailed April 16, 1898, with some cargo, from Trieste via Sicilian ports for New York, reaching Port Empedocle, Sicily, on the 21st. Here she took on board a quantity of sulphur, completing her cargo on the 24th of April. On April 25th Congress declared that war had existed between Spain and this country since April 21st. On the

same date the Queen Regent of Spain announced the existence of war with the United States, and authorized the royal navy to capture and confiscate contraband of war being carried under any flag. The master and managing agents of the ship, knowing that its course would take it within a few miles of the Spanish coast in order to sight lighthouses, and having learned from the Italian press that Spanish men-of-war were looking for contraband goods, and that a sulphur ship had been taken, relanded the sulphur, and refused to carry it on the contemplated voyage to New York. The Circuit Court of Appeals, speaking through Lacombe, Circuit Judge, has this to say:

"It seems manifest that, upon the outbreak of war, a voyage with contraband on board to the port of one of the belligerents might fairly be regarded as a risky piece of business. The suggestion made upon the argument that the naval power of Spain was not such as would induce a 'man of ordinary courage, judgment, and experience' to hesitate to proceed is of no weight. We may not attribute to the captain of the Styria knowledge gained after the event; and, indeed, this court is not advised of any historical facts which would warrant the conclusion that it was not entirely within the power of Spain during the first few months of the war to arrest and search every vessel westward bound through the Straits of Gibraltar, and picking her way along by the lighthouses on the Spanish coast."

After reciting several clauses of the charter party, among which is "(a) restraints of princes and rulers of people," the court proceeds:

"We find in clause (a) abundant authority for a refusal to carry forward the sulphur while such a condition of affairs existed as that already described as being generally known to exist when the discharge began on April 27th. There is no logical difference between a restraint of princes and rulers exercised by a cruiser with power to visit, search, and seize, lying two leagues off Cape Empedocle, and that exercised by a half-dozen cruisers patrolling a narrow strait through which, if the voyage be made, the vessel must pass. Under such circumstances the owner of contraband cargo (loaded, as this was, before war broke out) could with reason insist that it would be gross negligence on the part of the ship to bring his cargo forward. * * * That a well-founded apprehension of capture by the cruisers of a belligerent is the equivalent of an actual restraint is the doctrine of the later authorities."

The Supreme Court sustains this view of the Court of Appeals, and upholds the action of the master in relanding the sulphur; the court declaring that by so doing he "had due regard to the interests of all concerned in the ship and in the cargo, both that which was contraband and that which was not so."

In the course of the opinion in the Court of Appeals, the court takes occasion to remark that:

"The ship made no contract to carry contraband of war to the port of a belligerent, and should not be held to the obligations of a contract into which she has never entered."

The case of Nobel's Explosives Co. v. Jenkins, L. R. 1896, 2 Q. B. 326, cited by the Supreme Court, is also quite analogous. There the plaintiff's goods, which were contraband of war, had been placed aboard a general ship of the defendant for carriage from London to Yokohama, under a bill of lading containing a clause similar to the one here. The ship also contained noncontraband goods belonging to other shippers. The master landed the goods. The plaintiff forwarded

them later. and instituted suit for the freight paid for forwarding. I quote liberally from the opinion of Matthew, Judge, delivered in the case, as follows:

"The main ground of defense was the exception in the bill of lading of 'restraint of princes, rulers, or people.' A large body of evidence was laid before me to show that, if the vessel sailed with the goods on board, she would, in all probability, be stopped and searched. It was certain in that case that the goods would have been confiscated, and quite uncertain what course the captors would take with the ship and the rest of the cargo. I am satisfied that if the master had continued the voyage with the goods on board, he would have been acting recklessly. It was argued for the plaintiffs that the clause did not apply unless there was a direct and specific action upon the goods by sovereign authority. It was said that the fear of seizure, however well founded. was not a restraint, and that something in the nature of a seizure was necessary. But this argument is disposed of by the cases of Geipel v. Smith. L. R. 7 Q. B. 404, and Rodoconachi v. Elliott, L. R. 9 C. P. 518. The goods were as effectually stopped at Hong Kong as if there had been an express order from the Chinese government that contraband of war should be landed. The analogy of a restraint by a blockade or embargo seems to me sufficiently close. The warships of the Chinese government were in such a position as to render the sailing of the steamer with contraband of war on board a matter of great danger, though she might have got away safely. The restraint was not temporary. as was contended by the plaintiffs' counsel. There was no reason to expect that the obstacle in the way of the vessel could be removed in any reasonable time. I find that the captain, in refusing to carry the goods farther, acted reasonably and prudently, and that the delivery of the goods at Yokohama was prevented by restraint of princes and rulers within the meaning of the exception. * * *

"But, apart from the terms of the bill of lading, it seems to me that the conduct of the captain would be justified by reference to the duty imposed upon him to take reasonable care of the goods intrusted to him. Whether he has discharged that duty must depend on the circumstances of each case, and here, if the goods had been carried forward, there was every reason to believe that the ship would be detained and the goods of the plaintiffs confiscated."

A citizen of a neutral may, however, lawfully contract to carry contraband of war, and his undertaking will be enforced by the courts of the neutral state. While, by international law, trade by neutrals in contraband of war with belligerents is inhibited, and subjects the unlawful commerce to seizure and condemnation by a belligerent, and while neutral states recognize the right of imposing this restriction upon the action of its subjects, yet it has been judicially determined that this law is not inconsistent with the right of neutrals to trade in contraband with citizens of belligerent states, and to make contracts to that end, and to have the same enforced. The proposition may seem anomalous, but it appears to be sound, nevertheless. I quote the reasoning of Lord Westbury in its support:

"This right, which the laws of war give to a belligerent for his protection, does not involve as a consequence that the act of the neutral subject in so transporting munitions of war to a belligerent country is either a personal offense against the belligerent captor, or an act which gives him any ground of complaint either against the neutral trader personally or against the government of which he is a subject. The title of the belligerent is limited entirely to the right of seizing and condemning as lawful prize the contraband articles. He has no right to inflict any punishment on the neutral trader, or to make his act a ground of representation or complaint against the neutral state of which he is a subject. In fact, the act of the neutral trader in transporting munitions of war to the belligerent country is quite lawful, and the act of the

other belligerent in seizing and appropriating the contraband articles is equally lawful. Their conflicting rights are coexistent, and the right of the one party does not render the act of the other party wrongful or illegal. * * * But this commerce, which was perfectly lawful for the neutral with either belligerent country before the war, is not made by the war unlawful or capable of being prohibited by both or either of the belligerents; and all that international law does is to subject the neutral merchant who transports the contraband of war to the risk of having his ship and cargo captured and condemned by the belligerent power for whose enemy the contraband is destined." Carver on Carriage by Sea, p. 247.

So it has been held by the Supreme Court. In The Santissima Trinidad and The St. Andre, 7 Wheat. 283, 5° L. Ed. 454, the court says:

"The question, as to the original illegal armament and outfit of the Independencia, may be dismissed in a few words. It is apparent that, though equipped as a vessel of war, she was sent to Buenos Ayres on a commercial adventure, contraband, indeed, but in no shape violating our laws or our national neutrality. If captured by a Spanish ship of war during the voyage, she would have been justly condemnable as good prize for being engaged in a traffic prohibited by the law of nations. But there is nothing in our laws, or in the law of nations, that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure which no nation is bound to prohibit, and which only exposes the persons engaged in, it to the penalty of confiscation."

An insurance of contraband goods by a neutral is held valid, and, as remarked by Brown, District Judge, in The Spartan, supra, there seems to be no good reason why an express contract to carry such goods should not be as valid as a contract to insure them.

Now, with these principles established, what is the effect of entering into the contract in question, embodying the stipulation that the respondent shall not be liable for loss by "arrest or restraint of princes"? It must be conceded that the contract was made in the light of and with reference to the attending and existing circumstances and conditions. There was a condition of war existing between Russia and Japan. There was impending a proclamation issued by Russia declaring flour contraband of war; and there was on the high seas to the eastward of Japan the Russian flying squadron, seizing vessels of neutrals suspected of having on board articles contraband of war. At the same time the respondent company was entreating this government to intercede with Russia, and, if possible, to induce her to rescind her proclamation. Respondent was also appealing to the Japanese government to send out convoys to protect the respondent's vessels against seizure by Russian gunboats, and to conduct them safely into Japanese ports. Yet, with all these things impending and the conditions prevailing as recounted, respondent contracted with the libelants to carry the flour specified to Japan on the Nicomedia, her sailing date being August 28, 1904, or thereabouts.

It can hardly be disputed that the respondent entered into the contract with full knowledge of the existence of war conditions, and with the intention of carrying the flour notwithstanding these conditions. The Aragonia, another of respondent's vessels, sailed from Portland with flour for Japan on the 31st day of July, almost at the exact time that the contract was consummated, and the Aztec, a ship belonging to the Pacific Mail, but navigated for account of the respondent com-

pany, sailed with flour for Japan on September 25th, she having arrived in port at Portland on August 25th, and taken on her cargo after that date.  So that, in the light of these facts, the purpose to carry the flour of the libelants, notwithstanding the war conditions prevalent, becomes perfectly manifest.  The contract was one, in purpose and effect, to carry contraband of war.  Now, having entered into such a contract with that intent and purpose in view, what is the significance and intendment of the clause referred to?  It can hardly be contended that such intendment and signification should be the same as where the contract was made prior to the time that any such war conditions arose, or not in anticipation thereof.  If it can bear such a construction, the contract has made it optional with the respondent to carry or not as it might see fit from motives of its own, regardless of the fact that its purpose and intent was to carry, notwithstanding the dangers incident to the traffic or on account of the war.  I am impressed that it cannot bear that construction, but that when the clause "arrest or restraint of princes, rulers, or people" was introduced in the contract to carry notwithstanding the war conditions, the idea thereby voiced was that there must be actual and absolute arrest, and by that means a restraint of princes, and that it was not intended that anticipated or threatened interference with shipping should avail to annul the contract, when such conditions were then actually prevalent.  If the clause has not this meaning, in the light in which the contract was entered into, it is idle verbiage, or it operates, as before suggested, to extend to the respondent an option to carry or not, as it might feel so disposed.  Every clause, as every word of a contract, must be given effect, if possible, and, where the meaning is not clear, it is necessary that regard shall be had to the nature of the instrument itself, the condition of the parties executing it, and the object and purposes they had in view.  Furthermore, the words of the contract will be given a reasonable construction where that is possible, rather than an unreasonable one.  9 Cyc. 580, 587.  It is not to be supposed that contracts are entered into to be avoided at the will and pleasure of either of the parties, unless such a purpose be so expressed by clear enunciation.  They are rather to be considered as mutually obligatory, and the construction, where the language is of doubtful import, that will give them that effect, should, from principles of right and equity, be adopted.  The libelants were willing to take their chances of the flour being lost through dangers of war.  Their manager says as much in his testimony.  And the respondent was willing to carry the flour, and also to take its chances of the impending dangers.  This is manifest from the fact that, at the time the contract of affreightment was made, it was actually carrying flour on another ship to Japan, and continued to contract and to carry the commodity on a boat subsequently sailing; and all this after the Arabia had been arrested and its cargo of flour confiscated.  Libelants were the owners of a part of that cargo.  It seems most reasonable, therefore, that the respondent agreed to carry as against all restraint of princes except actual arrest or seizure and confiscation, and the contract, viewed in the light of the attendant conditions, will bear this interpretation without doing violence to the language thereof.  The in-

terpretation is manifestly the more just.   Hence, I hold that the libelants are entitled to recover what damages they have sustained by reason of the refusal to carry their flour as agreed.

The case of The Styria, supra, in both the Court of Appeals and the Supreme Court, and the case of Nobel's Explosives Co. v. Jenkins, supra, were each determined in the main upon the legal principle that the master or owner of the ship has a discretion for the safety of the boat and cargo in landing or refusing to carry goods contraband; and this he must exercise in the interests of all concerned in the ship and the cargo, having regard for both that which is contraband and that which is not so.   But how can the principle of discretion in the master or owner apply where the contract is one to carry contraband, as the one in suit is?   Having such a discretion not to carry contraband, why did not the respondent avoid the complication by refusing to enter into any contract at all?   The conditions must, from the very nature of things, be different where the owner, notwithstanding his discretion to refuse to carry contraband where, in the interest of the ship and of the cargo, it would be dangerous to do so under conditions of war subsequently arising, deliberately enters into a contract to carry that class of cargo when the war conditions are actually present.   In the case of The Styria the fact that the contract was not one to carry contraband was emphasized by the court, and there can be but little doubt, both as it respects that and the English case, that if the contract had been of that nature the judgment of the court would have been different.

By reason of the respondent's refusal to carry libelants' flour as per the agreement, the libelants were compelled to ship by way of Seattle, in order to meet their obligations at ports in Japan, at an increased rate of freight.   They shipped on August 31, 1904, on the Oanfa; 122 tons to Jardine, Matheson & Co., destination Kobe, at the rate of $4.50 per ton; 65 tons to the same consignees at Moji at the same rate; and 251 tons to Samuel Samuel & Co., on two consignments to Yokohama, comprising 438 tons in all.   On September 5th the libelants shipped, on the steamship Quito, out of Seattle, 656 tons of flour to Jardine, Matheson & Co., by two consignments, to Yokohama, at the rate of $5 per ton, and 175 tons to Samuel Samuel & Co., Yokohama, at the same rate; thus incurring a loss on the shipment by the Oanfa of 50 cents per ton, and on the Quito of $1 per ton, the entire loss amounting to $1,050, which amount the libelants are entitled to recover against the respondent.

A decree will be entered accordingly.